Filed 9/10/21

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C089464 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE017280) |
| v. | |
| MICHAEL SCOTT BAREFIELD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Matthew J. Gary, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Timothy L. O'Hair, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II, III, IV, V, and VI of the Discussion.

Defendant Michael Scott Barefield appeals from his convictions of corporal injury, assault with a deadly weapon, and false imprisonment arising from his attack against a former girlfriend. He claims the trial court erred by: (1) admitting evidence in violation of the marital testimony privilege; (2) admitting propensity evidence; (3) admitting fresh complaint evidence; (4) not staying his sentence on the false imprisonment count; and (5) using the firearm possession to impose the upper-term sentence on the assault count and a firearm enhancement.

Although the court admitted evidence in violation of the marital privilege, the error was harmless. We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

June 9-10, 2017 attack

Hazel Doe and defendant started dating in 2013. They lived together, but she moved out multiple times, moving out for the last time in January 2016. They had a child. By June 2017, Hazel was dating another person, but she and defendant had discussed reconciling.

On June 6, 2017, Hazel and defendant had consensual sex at defendant's residence. The following day, Hazel told defendant she had feelings for someone else.

On June 9, 2017, defendant invited Hazel to go out for a drink. They met at a bar, had drinks, and watched a basketball game. After the game, defendant asked her to go to dinner with him. She declined the invitation; she wanted to be home with her daughter who had not been feeling well.

Hazel arrived home around 9:00 or 10:00 p.m. As she opened the front door to her residence, defendant rushed up behind her. He told her he wanted to have dinner with her, but she reminded him that she needed to be home. Defendant followed her inside and continued to ask her to go to dinner. Defendant's demeanor had changed and it frightened Hazel, but she "begrudgingly agreed" to go to dinner to avoid a physical

confrontation in her home. She and defendant had engaged in physical confrontations in the past.

Defendant drove them to a drive-through Mexican restaurant near his apartment. While in the drive-through lane, defendant got out of the car and walked to a nearby liquor store to buy alcohol. Hazel got into the driver's seat and continued through the drive-through.

Hazel drove them to defendant's apartment. They arrived at around 11:00 or 11:15 p.m. They went into his kitchen, unwrapped their food, and began eating. Hazel had not wanted to go that far from her house, so she took a few bites and then asked defendant to take her home. Defendant eventually agreed.

As Hazel gathered her belongings, defendant walked up to her and tried to kiss her. She pulled away and said she really needed to go. He continued trying to kiss her and she continued moving away and saying she needed to go. During this banter, the two shifted positions. Defendant was closer to the front door and had his back to it; Hazel was closer to the hallway with her back toward the hallway and bedrooms.

Defendant used his body to back Hazel into the bedroom. She tried to maneuver around him and said she did not want to "do this now." He backed her up to the bed, and she fell backwards onto it. He fell on top of her and grabbed her clothes. She continued telling him to stop and that she needed to leave, but he became more aggressive. He placed his forearm on her collar bone to hold her down and tried to take her clothes off with the other hand. She told him he was hurting her, and she tried to shove him off. The more she fought, the more his forearm grip tightened. She stopped resisting, as it was making things worse. Defendant had sex with her. He talked during the act and was "coercing [her] to kind of get into it[.]" She "just laid there" and "wasn't responding at all." After he finished, he started to get dressed, and he told Hazel to get dressed.

At this point, defendant's demeanor "totally changed[.]" As Hazel dressed, he started yelling at her. He called her a whore and accused her of prostituting herself with

the man she was dating.  Rambling, he said she embarrassed him, everyone knew what she was doing.  Hazel was confused because she did not know what he was talking about.  The more he yelled, the more excited he became, and the more afraid Hazel became.

As she bent over to put on her shoes, defendant swung at her and hit her on her right cheek.  She spun around, and defendant, still yelling at her, hit her again.  She tried to strike back with a toy, but he blocked it.  He hit her with "an onslaught of punches," punching her "repeatedly."  She tried to defend herself and hit back, but he grabbed her and shoved her onto the bed.  As she sat up, she saw defendant reach into the top of a closet.  Hazel heard a click, and when defendant turned around, he pointed a handgun at her head.

Defendant hit her with the gun across the right side of her face.  She put up her arms to protect herself, but he repeatedly hit her with the gun "over, and over, and over again."  She fell to the floor, and defendant kicked her "multiple times" in her back, stomach, and ribs.  About four or five times, defendant left the room and returned with a beer, hitting her each time.  He stopped yelling, and at one point he said to her, "I see you looking at the gun.  I'm not going to shoot yo stupid ass."  He dropped the clip out of the gun, hit her with the gun again, put the gun in his pocket, and continued to hit her with his hand.

When defendant eventually went to the bathroom, Hazel grabbed her keys and phone, and she ran out of the apartment.  She forgot to take her purse.  She hid in some bushes on the opposite side of defendant's apartment building.  She heard defendant come out the door, walk around a bit, walk back to his apartment, and close the door.  Defendant had kept her at his apartment against her will from the moment she wanted to leave for an hour and 15 minutes.  She called 911.

While waiting for police to arrive, around 1:30 a.m. Hazel began exchanging text messages with a friend, L.T., and asked her to call the police.  L.T. called Hazel, but Hazel responded, "I can't answer."  In one of her messages to L.T., Hazel stated that

defendant pulled a gun on her and pistol whipped her. L.T. called 911 several times. Shortly after 2:30 a.m., L.T. and her boyfriend picked Hazel up outside defendant's apartment. She had one shoe on. She got into the back seat and slumped over. She was upset, holding her head, and crying. They drove her home.

Hazel drove herself to the hospital. When she arrived, she called her ex-husband, Maurice Wheatley, to meet her there. She told him that defendant had attacked her and struck her with a gun.

Hazel told the hospital doctor that she had been physically attacked by a gun and the assailant's hands and feet. She did not tell the doctor that she had been sexually assaulted because she was still shaken up and there were others in the room. She hoped to have a private conversation later with the doctor, but that did not occur. Later that day, she told L.T. about the sexual assault.

Hazel suffered swelling, scrapes, and bruising on her arm, face, back, shoulder, finger, head, and around her eye. Photos of her injuries were shown to the jury. At trial, she had a scar on her right arm and another across the right side of her face from the pistol whipping.

Around 9:00 a.m. June 10, M.W. called Hazel. M.W. was defendant's legal wife, and Hazel was friendly with her. M.W. told Hazel that defendant had asked her to return Hazel's purse but also to ask Hazel for his gun back. Hazel told M.W. she did not have defendant's gun; defendant had pistol whipped her, kicked her, punched her, and forced her to have sex with him. M.W. said she believed Hazel because outside of the gun, she had had the same experience.

Hazel testified of other incidents when defendant physically abused her. Sometime in 2015, defendant and she got into an argument, and he shoved her and pushed her face into a couch. Defendant had been drinking.

On one occasion, she and defendant were at a bar and had been drinking heavily. He became angry over her not noticing certain people that came into the bar. When they

got home, defendant hit Hazel twice in the face with his fist. He went into the garage, and she locked the door behind him. He broke the door off its hinges.

On another occasion, defendant grabbed Hazel by her shirt and pushed her against the wall. He put his hands around her throat and said, "[Y]ou think I'm playing with you? I'll F you up."

Another incident occurred in July 2016 after defendant and Hazel had stopped dating. After attending a funeral, they went back to his family's house. Defendant left the house for three to four hours, leaving Hazel and their baby there with no transportation. When defendant returned, he was heavily intoxicated. Hazel and defendant got into a shouting match that turned into "an all out fist fight" while she was holding the baby in her arms.

### Other evidence

The trial court admitted evidence of uncharged acts of violence defendant had committed against M.W. and L.W. We discuss this evidence below.

The prosecution also presented expert testimony regarding domestic violence. Defendant testified on his own behalf.

### Verdict and sentence

The jury convicted defendant of inflicting corporal injury on the parent of defendant's child, assault with a semiautomatic firearm, and false imprisonment by violence, menace, fraud, and deceit. (Pen. Code, §§ 273.5, subd. (a); 245, subd. (b); 236; 237, subd. (a).) (Statutory section citations that follow are to the Penal Code.) The jury also found true personal firearm use enhancement allegations on the assault and false imprisonment counts. (§ 12022.5, subds. (a), (b).) The jury hung on a count of rape by force, and the court declared a mistrial on that count. (§ 261, subd. (a)(2).)

The trial court sentenced defendant to an aggregate prison term of 19 years, 8 months, calculated as follows: the upper term of nine years for the assault plus 10 years

for the firearm enhancement, and a consecutive eight months (one-third the mid-term) for false imprisonment.  The court imposed and stayed sentencing on the corporal injury count under section 654.

DISCUSSION

I

*Evidence Subject to the Marital Privilege*

Defendant contends the trial court erred when it denied M.W.'s assertion of the marital testimony privilege and admitted her testimony of uncharged acts of abuse defendant had committed against her.  It also erred in admitting Hazel's complaint of the offense to M.W. on the phone.  Although their divorce had been pending for years, defendant and M.W. were still legally married at the time of trial, and there is no exception to the marital privilege if the marriage is nonviable.  We agree the trial court erred.

A.    Background

Defendant and M.W. were married in 2004.  They had two children together. They separated in 2007, and they reunited and separated several times after that.  In 2009, defendant filed dissolution papers, but the divorce was not final by the time of trial in 2018 due to filing difficulties.  The two have not lived together since 2010.

The prosecution moved to admit defendant's prior uncharged acts of domestic violence against M.W.  M.W. asserted the marital privilege not to testify against defendant.  (Evid. Code, § 970.)  The trial court found there was no marital privilege. Relying on California family law's use of the date of separation as the demarcation for determining divorcing spouses' community and separate property, the court determined that the right to the marital privilege ended when the parties separated, even though they were still legally married.  (See Fam. Code, §§ 771, 70.)

As a result, M.W. testified to four incidents of physical abuse by defendant against her. On February 26, 2009, defendant questioned M.W. in his car about one of her male friends. He hit M.W. in the face. M.W. swung back and kicked him. She tried to get out of the car, but he locked the doors and drove off. She repeatedly asked to get out of the car, but he drove her to his house and made her talk with him there.

On March 17, 2009, defendant slapped M.W., and she grabbed him by the hair and pulled him to the ground. They let each other get up, but defendant took her phone and her purse. As she walked home, defendant turned around and pulled up in his car. When he got out, he started hitting her. She again pulled him by his hair to the ground as he continued hitting her. They let each other up and went to his home. Defendant let her leave around 7:00 a.m.

On the evening of June 26, 2010, defendant and M.W. were at a club celebrating her birthday with her sister, her sister's husband, and others. After becoming agitated with someone at the club, defendant drove the group to M.W.'s sister's house. He drove erratically, almost crashing into a wall and other cars. At her sister's house, M.W. tried to open her door to get out of the car, but defendant pulled it shut. Once she got out, defendant grabbed her by her arms so hard they both fell to the ground. She kicked him hard enough that he fell off of her. He got into his car and drove off. M.W. got into her sister's car, and as they drove off, defendant pulled up and cut them off. Her sister put the car in reverse, but defendant ran up, grabbed the mirror, and yelled at M.W. to get out. Her sister slowed down, and defendant got off the car. M.W. called 911.

On March 17, 2012, M.W. met defendant at a bar he owned. While she was there, defendant told someone she was his wife and she was cheating on him. This made her feel uncomfortable because they had been separated for years, so she left. Defendant chased after her and pushed her. She pushed back and they both began punching each other. She ran off to get away from him, but he found her and told her to get into his car. She was lost, so she got in. She wanted to go home, but he took her to his house. They

argued, but eventually they had sex. She did not want to have sex with him, but she did not object because she just wanted the night to be over.

In addition to relating defendant's prior acts, M.W. testified under the fresh complaint doctrine, over defendant's objection, about Hazel's statement to her during their phone call. M.W. stated that defendant contacted her on June 10, 2017. He asked her to return Hazel's purse. He also asked her to ask Hazel for his gun back. He said Hazel had taken his gun the night prior. Defendant came by M.W.'s home and gave her the purse. M.W. then called Hazel to let her know she was on her way to Hazel's house. Hazel said she was not home, but M.W. could still drop the purse off. Hazel also told her what had happened. She and defendant had a physical alteration, and she fled the house without her bag. She said defendant held her against her will, hit her several times, forced her to have sex with him, and that a gun was involved. M.W. said that Hazel sounded upset. It did not sound to M.W. that Hazel was making it up.

B.    Analysis

Defendant contends the trial court erred when it ruled that the marital testimony privilege did not apply to M.W. and ordered her to testify. The privilege is given to "married person[s]," and defendant and M.W., though separated, were still legally married. (Evid. Code, § 970.) Defendant argues that the trial court's use of family law to hold that the marriage privilege did not apply because they were separated violated the clear and express terms of the statutory privilege and wrongfully created an exception to the privilege.

In California, no person has a privilege to refuse to be a witness except as otherwise provided by statute. (Evid. Code, § 911, subd. (a).) All evidentiary privileges are statutory. (*People v. Sinohui* (2002) 28 Cal.4th 205, 211 (*Sinohui*).) We thus interpret them by applying the rules of statutory construction. (*Id.* at pp. 211-212.)

" 'When we interpret a statute, "[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy."  [Citation.]  "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' (*Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 165-166.)" (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616-617.)

In addition to the rules of statutory construction, we are guided by rules governing evidentiary privileges.  (*Sinohui, supra*, 28 Cal.4th at p. 212.)  "Because privileges 'prevent the admission of relevant and otherwise admissible evidence,' they 'should be narrowly construed.'  (*People v. McGraw* (1983) 141 Cal.App.3d 618, 622 [].)  Applying this maxim in the marital privileges context, our courts have broadly construed the exceptions to these privileges."  (*Sinohui, supra*, 28 Cal.4th at p. 212.)

However, judicial construction of evidentiary privileges is nonetheless restricted. "The privileges set out in the Evidence Code are legislative creations; the courts of this state have no power to expand them *or to recognize implied exceptions*."  (*Wells Fargo Bank v. Superior Court* (2000) 22 Cal.4th 201, 206, italics added.)  An evidentiary privilege "is a legislative creation, which courts have no power to limit by recognizing implied exceptions."  (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 739.)  The area of privileges "is one of the few instances where the Evidence Code

precludes the courts from elaborating upon the statutory scheme." (Cal. Law Revision Com. com., West's Ann. Cal. Evid. Code, foll. § 911.)

Evidence Code section 970 codifies the marital testimony privilege. It states, "Except as otherwise provided by statute, a married person has a privilege not to testify against his [or her] spouse in any proceeding." A married person also has a privilege not to be called as a witness in any proceeding to which his or her spouse is a party. (Evid. Code, § 971.) The Legislature codified exceptions to the privilege in Evidence Code section 972. For example, an exception to the privilege exists for a criminal proceeding in which one spouse is charged with a crime against the person or property of another spouse or a crime against the person or property of a third person committed in the course of committing a crime against the person or property of the other spouse. (Evid. Code, § 972, subd. (e).) That exception does not apply in this matter. However, statutory exceptions to the privilege do not include the spouses' separation prior to dissolution or for the marriage becoming nonviable. "The purpose of the spousal testimony privilege is to preserve marital harmony." (*People v. Sinohui, supra*, 28 Cal.4th at p. 213.) Jurisdictions that recognize some form of this privilege "do so because the privilege allegedly ' "preserve[s] marital harmony," ' ' "protect[s] marital privacy," ' and ' "promote[s] the socially beneficial institution of marriage." ' [Citation.]" (*Id*. at p. 211.) "The rationale of the privilege provided by Section 970 not to testify against one's spouse is that such testimony would seriously disturb or disrupt the marital relationship. Society stands to lose more from such disruption than it stands to gain from the testimony which would be available if the privilege did not exist." (Cal. Law Revision Com. com., West's Ann. Cal. Evid. Code, foll. § 970.)

The marital privilege is available until the marriage is dissolved by a final judgment of dissolution even though the marriage became nonviable years before. (*Jurcoane v. Superior Court* (2001) 93 Cal.App.4th 886, 900 (*Jurcoane*).) The privilege is not available after the marital relationship is terminated by divorce. (*People v. Dorsey*

(1975) 46 Cal.App.3d 706, 716-717.)  But if a final decree of divorce has not been obtained, the testifying spouse may claim a privilege not to be a witness.  (*Id*. at p. 717.)

*Jurcoane* addressed the issue raised here.  In *Jurcoane*, the court of appeal held that the marital privilege applied even if the couple had been separated for many years but the marriage had not been formally dissolved.  There, the husband fled the country after he was charged with murder.  The husband and wife never divorced, but they had no contact with each other for 17 years.  During that time, the husband assumed a false name, claimed Mexican citizenship, resumed his work as an auto mechanic, and lived with a Mexican woman.  He never provided economic assistance to his wife.  After his extradition, the wife asserted the marital privilege not to testify at the husband's preliminary hearing.  (*Id*., *supra*, 93 Cal.App.4th at pp. 889-891.)

The court of appeal held that the wife's assertion of the privilege was lawful.  The issue was one of statutory interpretation subject to the court's lack of authority to imply the existence of exceptions to the privilege.  Evidence Code section 970 granted the privilege unambiguously to "married persons."  The Legislature had defined how a legal marriage was brought into being, and it had "defined how marriages can be dissolved: 'Marriage is dissolved *only* by one of the following:  [¶] (a) The death of one of the parties.  [¶] (b) A judgment of dissolution of marriage.  [¶] (c) A judgment of nullity of marriage.'  (Fam. Code, § 310, italics added.)"  (*Jurcoane, supra*, 93 Cal.App.4th at p. 896.)  "[T]he statutes defining the marital testimonial privilege facially do not include a proposed exception to the privilege where a still legally intact marriage is 'moribund,' 'abandoned,' or 'no longer viable[,]' " and the court had no authority to imply the existence of such an exception to the privilege.  (*Id*. at p. 897.)  Because the wife was a married person at the time of the hearing, her claim of marital privilege was lawful even though she had not seen her husband for 17 years.  (*Id*. at p. 900.)

*Jurcoane's* reasoning applies here.  The evidence is undisputed that defendant's marriage to M.W. is no longer viable.  However, the marriage had yet to be terminated by

a final judgment of dissolution.  Because the statutory language of the marital privilege and its exceptions is clear, and because we have no authority to imply the existence of an additional exception to the privilege, we must hold that M.W.'s claim of marital privilege was lawful.

The Attorney General contends we should not follow *Jurcoane* for a number of reasons.  He argues that contrary to *Jurcoane's* holding, the terms "married persons" or "spouses" as used in the privilege statute are not facially clear.  He claims that looking at the terms, one cannot tell whether they include such relationships as bigamous or polygamous marriages, common law marriages from other states, domestic partnerships, putative spouses, or cohabitants.

The Attorney General's concerns are unfounded.  Case authority has made clear who "married persons" are for purposes of the marital privilege.  If a defendant's marriage is illegal and void, the defendant's purported spouse has no right to assert the marital privilege.  (See *People v. Gallego* (1990) 52 Cal.3d 115, 176-177.)  For example, the privilege does not exist in a bigamous marriage, an incestuous marriage, or in a marriage entered into solely for fraudulent purposes.  (*Ibid.* [bigamous]; *People v. MacDonald* (1938) 24 Cal.App.2d 702, 704-707 [incestuous]; *Lutwak v. United States* (1953) 344 U.S. 604, 614 [97 L.Ed. 593] [sham marriage].)  The marital privilege also does not extend to unmarried cohabitants.  (*People v. Delph* (1979) 94 Cal.App.3d 411, 415-416.)  And a putative spouse by definition is not a party to a valid marriage.  (Fam. Code, § 2251, subd. (a).)

On the other hand, California recognizes the validity of a common law marriage contracted in another state which would be valid under the laws of that state.  (*Knight v. Superior Court* (2005) 128 Cal.App.4th 14, 19.)  And registered domestic partners "have the same rights, protections, and benefits," and are "subject to the same responsibilities, obligations, and duties under law," whether those rights and duties are derived from "statutes, administrative regulations, court rules, government policies, common law, or

any other provisions or sources of law, as are granted to and imposed upon spouses."
(Fam. Code, § 297.5, subd. (a).) Arguably, common law spouses and domestic partners
would be entitled to exercise the marital privilege. The Attorney General's argument
does not establish that the terms "married persons" and "spouses" in Evidence Code
section 970 are not clear or are ambiguous.

The Attorney General argues that even if the terms "married persons" and
"spouse" are clear and unequivocal, the "plain meaning" rule does not prevent us from
determining whether the literal meaning of the statute comports with its purpose. Under
*California School Employees Assn. v. Governing Bd.* (1994) 8 Cal.4th 333 (*California
School Employees Assn.*), courts will not follow the plain meaning of statutory language
when to do so would frustrate the manifest purposes of the legislation as a whole or lead
to absurd results. (*Id.* at p. 340.) "If the [statutory] language is clear, courts must
generally follow its plain meaning unless a literal interpretation would result in absurd
consequences the Legislature did not intend." (*City of San Jose v. Superior Court, supra*,
2 Cal.5th at p. 616.)

The Attorney General claims that allowing the privilege here would lead to absurd
results. Relying on the privilege's statutory language where a couple is all but officially
divorced defeats the privilege's purpose. When the parties have factually severed the
relationship, little reason exists to protect marital harmony. Privileges "are looked upon
with disfavor" because "granting of a claim of privilege can serve only to 'shut out the
light[.]' " (*People v. Delph, supra*, 94 Cal.App.3d at p. 415, quoting McCormick on
Evidence (2nd ed. 1972), § 77, p. 156.) Applying the privilege here where there is no
marital relationship to protect, unnecessarily excludes evidence where no private interest
is at stake. The Attorney General contends that we should interpret the marital privilege
narrowly—or more narrowly than the meaning of its clear language—so that it is limited
to the Legislature's intended purposes. That is, according to the Attorney General, the

marital privilege should apply only when it serves to protect marital harmony and open communication between spouses.

The Attorney General further argues that the trial court's reliance on California family law's use of the date of separation was a reasonable basis to determine when the privilege will no longer further its legislative purpose. The trial court based its ruling that the privilege did not apply on the demarcation provided by the Family Code for determining a divorcing couple's community and separate property. Family Code section 771 declares that the earnings and accumulations of a spouse after the "date of separation" are the separate property of that spouse. (Fam. Code, § 771, subd. (a).) Family Code section 70 defines the "date of separation" as "the date that a complete and final break in the marital relationship has occurred, as evidenced by both of the following: (1) The spouse has expressed to the other spouse the intent to end the marriage[; and] (2) The conduct of the spouse is consistent with the intent to end the marriage." (Fam. Code, § 70, subd. (a).) The Attorney General argues the date of separation so defined is a reasonable basis for determining when the purposes of the marital privilege—promoting marital harmony—are no longer served.

The Attorney General's policy argument may have merit. However, as already stated, the Legislature and the California Supreme Court have restricted our authority to construct an evidentiary privilege beyond its unambiguous terms. California courts "do not enjoy the freedom to restrict California's [evidentiary privileges] based on notions of policy or ad hoc justification." (*Wells Fargo Bank v. Superior Court, supra*, 22 Cal.4th at p. 209.) "[W]e have no power to create such exceptions." (*Id*. at p. 208.) We are aware of no published opinion where a California appellate court construing an evidentiary privilege has implied the existence of an exception to the privilege by exercising its authority recognized in *California School Employees Assn.* not to follow the plain meaning of the privilege's statutory language where doing so would result in absurd consequences the Legislature did not intend.

The Attorney General cites *People v. Gomez* (1982) 134 Cal.App.3d 874 to suggest that courts are amenable to the argument. The defendant there pursuant to Evidence Code section 980 sought to exclude from evidence threatening statements he made to his estranged spouse. Evidence Code section 980 privileges confidential communications between spouses. The trial court ruled the evidence was admissible, as the threats were made in the presence of others and were not confidential. The court of appeal affirmed on that basis. (*Id*. at p. 879.)

However, before reaching its decision, the court stated it was "leav[ing] aside the issue whether the privilege was intended to apply to communications made after a couple has separated but before the legal dissolution of the marriage is final." (*People v. Gomez, supra*, 134 Cal.App.3d. at p. 879.) In a footnote, the court stated, "The purpose of the privilege is to encourage free and open communication between spouses. (See Evid. Code, § 980, [C]omment, Law Revision Com[mission].) Once the parties have factually severed the relationship, little reason exists to protect the couple's communications or to extend a privilege to a confidential relationship that no longer exists." (*Id*. at p. 879, fn. 1.)

The court of appeal's statement is dicta and has no precedential value. The court also made no mention of the restrictions the Legislature and the Supreme Court have placed on our authority to imply an exception to an evidentiary privilege. Again, exceptions to the privilege are limited to those adopted by the Legislature. (*Wells Fargo Bank v. Superior Court, supra*, 22 Cal.4th at p. 206.) Given the statutory nature of privileges and their exceptions, if the Legislature had intended to terminate the marital privilege upon a married couple's separation, it could have adopted such a provision similar to Family Code section 70. The omission of such an exception indicates the Legislature did not intend for the privilege to end upon separation prior to divorce. (See *id*. at p. 207 ["If the Legislature had intended to restrict [the attorney-client privilege], it

would likely have declared that intention unmistakably, rather than leaving it to courts to find the restriction by inference . . . ."].)

We also are not convinced that granting the privilege in this instance results in absurd consequences the Legislature did not intend. At trial, M.W. testified that she did not want to be in court testifying against defendant. She was trying to coexist with defendant in order to raise their children. The Legislature could rationally believe that protecting estranged spouses from testifying against each other as they attempt to co-parent their children ' "promote[s] the socially beneficial institution of marriage" ' and protects society from the harm further disruption to their relationship may cause. (*People v. Sinohui, supra*, 28 Cal.4th at p. 211; Cal. Law Revision Com. com., West's Ann. Cal. Evid. Code, foll. § 970.)

We thus hold the trial court erred when it denied M.W.'s assertion of the marital testimonial privilege and ordered her to testify. We will determine whether the error was prejudicial after considering defendant's other evidentiary arguments.

II

*Admission of Propensity Evidence*

Defendant claims the trial court erred by admitting evidence of his uncharged acts of abuse against M.W. and another former girlfriend, L.W., pursuant to Evidence Code sections 1109 and 1101, subdivision (b). We have already described M.W.'s testimony of defendant's prior acts and determined the court erred by admitting M.W.'s testimony. But we conclude the trial court did not err in admitting L.W.'s testimony under Evidence Code section 1109 (section 1109), and we do not reach defendant's arguments under Evidence Code section 1101 (section 1101).

A.    Background

The prosecutor sought to introduce evidence of an uncharged act defendant committed against L.W. under section 1109. Defense counsel objected that admitting the evidence would be unduly prejudicial under Evidence Code section 352 (section 352). Counsel claimed that L.W. instigated the incident. He argued that admitting her testimony would be "a mini trial within a trial," consuming an undue amount of the court's time, as counsel would take a day to call three to four witnesses to testify concerning the incident. The prosecutor argued that L.W.'s testimony would take no more than 30 minutes of the trial, and its probative value of showing defendant's propensity to commit domestic violence outweighed any prejudicial effect.

The trial court granted the prosecution's request. Applying the test of undue prejudice from section 352, the court found the evidence's probative value was high "given the nature of the charges and the allegations that are being made." It also found that the evidence's probative value was not substantially outweighed by the consumption of time needed to present it. Even if defense counsel called three or four witnesses to rebut the testimony, those witnesses would not consume an undue amount of time given the trial's anticipated length.

At trial, L.W. testified that she and defendant lived together for two or three months in 2012. They have a child. On the evening of September 8, 2013, L.W. dropped their then seven-month old baby off at defendant's house for defendant to watch while she ran errands. When she returned at approximately 11:00 p.m., there were five or six other people there. People were drinking alcohol. She smelled marijuana. This angered L.W. as she had wanted defendant to spend time with the baby. Inside, the baby was in a jumper that clamped onto a door opening. Defendant's 11-year-old daughter was in a back room by herself.

L.W. went "ballistic" because defendant had people over instead of watching his child. She and defendant began arguing and yelling. Defendant had the baby in his hands. Yelling at each other, they walked toward her car with defendant's daughter. L.W. yelled at defendant to hand over the baby. Defendant yelled at L.W. to "just fucking leave" multiple times and cussed at her by calling her out of control and words to that effect. Someone took the baby from defendant and he and L.W. fought. She hit him and "something" hit her mouth, but she did not know which happened first. On rebuttal, L.W. said defendant hit her and "got" her in her teeth. This was the first time defendant "put hands" on her.

Detective Shaun McGovern investigated the incident. L.W. told him that as she was yelling at defendant to hand over the baby, defendant hit her with an open hand in her forehead, and then she was hit again by something hard in her teeth. She said she did not strike defendant before he hit her. The detective arrested defendant for domestic violence. Upon his arrest, defendant admitted that he had been arrested once for assaulting T.G., the mother of his 11-year-old daughter.

B.      Analysis

Generally, evidence of specific instances of a defendant's prior conduct is inadmissible to prove his conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) Section 1109 provides an exception to the general rule against propensity evidence. Under that statute, "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352" and the prior acts occurred no more than 10 years before the charged offense. (Evid. Code, § 1109, subds. (a)(1), (e).)

Defendant claims the trial court erred in admitting evidence of his altercation with L.W. under section 1109 because the evidence was unduly prejudicial under section 352.

He argues that the evidence was not sufficiently probative. It had little reason to prove he assaulted Hazel because different victims were involved in different circumstances. He also claims the evidence was unduly prejudicial because it would lead the jury to punish him for his prior misdeeds rather than judge his guilt in the charged offenses. Introducing the evidence also took an undue amount of trial time.

"Generally, we review a trial court's decision to admit or exclude evidence for an abuse of discretion. (*People v. Herrera* (2016) 247 Cal.App.4th 467, 475.) An abuse of discretion occurs when a court makes a decision in an 'arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' (*People v. Jordan* (1986) 42 Cal.3d 308, 316.) In other words, the decision ' " 'exceed[ed] the bounds of reason, all of the circumstances before it being considered' " [citation] or its decision [was] "so irrational or arbitrary that no reasonable person could agree with it." ' (*Wade v. Superior Court* (2019) 33 Cal.App.5th 694, 708.)" (*People v. Thomas* (2021) 63 Cal.App.5th 612, 626.)

"Section 352, which section 1109 'expressly incorporates' (*People v. Kerley* (2018) 23 Cal.App.5th 513, 532), gives the trial court discretion to exclude or admit evidence of past domestic violence after the court weighs the probative value of the evidence against 'the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury' (§ 352). The law requires ' "the probative value of the evidence must be balanced against four factors: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses." ' (*People v. Culbert* [(2013)] 218 Cal.App.4th 184,] 192.) ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.)" (*People v. Thomas, supra*, 63 Cal.App.5th at p. 630.)

The trial court did not abuse its discretion when it determined that admitting L.W.'s testimony under section 1109 was not unduly prejudicial under section 352. The evidence was probative. It tended to show that defendant assaulted women with whom he had intimate relationships. In both instances, defendant yelled at the victims, called them derogative names, and hit them in the face.

It is also not likely the jury found him guilty of assaulting Hazel as punishment for his assault of L.W. " ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' (*People v. Karis* (1988) 46 Cal.3d 612, 638.)" (*People v. Scott* (2011) 52 Cal.4th 452, 491.) Defendant's assault against L.W. was not as severe or as emotionally troubling as his attack on Hazel.

Further, admission of the evidence did not consume an undue amount of time. Defendant claims the evidence required an excessive amount of trial time because it takes up 41 pages of the reporter's transcript. Forty-one pages is a small fraction of the more than 1,100 pages of the reporter's transcript, of which more than 700 pages recorded the taking of testimony before the jury.

The evidence indicates that the trial court did not abuse its discretion when it admitted testimony of defendant's assault of L.W. under section 1109.

III

*Admission of Fresh Complaint Evidence*

Defendant claims the trial court erred when it admitted Hazel's "fresh complaint" statements to her ex-husband, Maurice Wheatley, and to M.W. explaining what had happened during the attack. It assertedly erred because the evidence was used for the truth of the matter asserted and because of the length of time that elapsed between the attack and when Hazel made the statements. We have already determined it was error to

admit the testimony from M.W., but the court did not err in admitting fresh complaint evidence from Wheatley.

A.     Background

The trial court granted the prosecution's requests to introduce as "fresh complaint" evidence Hazel's statements to Wheatly and M.W. that defendant had assaulted her.

Wheatley testified that he received a call from Hazel at approximately 3:00 a.m. on June 10, 2017. She was at the hospital. She told Wheatley that defendant had pistol whipped her and held her hostage. Wheatley went to the hospital and asked Hazel what had happened. She told him that defendant was drinking and talking crazy, and that he held her hostage and hit her with a gun.

After a medical test, Hazel said to Wheatley, "[H]e, you know." Wheatley said, "[H]e took it." Hazel responded, "[Y]eah, he took it." Wheatley explained that "taking" meant "[h]er sexuality, just taking it."

Wheatley spoke with Hazel later that day. Hazel described the incident to him, explaining that the argument turned into defendant pulling out a gun. Defendant sexually assaulted her and pistol whipped her. He was also hitting her on her side.

B.     *Analysis*

"[P]roof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose— namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749-750.)

The fresh complaint doctrine is not an exception to the hearsay rule. "In sexual as well as nonsexual offense cases, evidence of the fact and circumstances of a victim's

complaint may be relevant for a variety of nonhearsay purposes, regardless whether the complaint is prompt or delayed. To begin with, if such a victim did, in fact, make a complaint promptly after the alleged incident, the circumstances under which the complaint was made may aid the jury in determining whether the alleged offense occurred. Furthermore, admission of evidence that such a prompt complaint was made also will eliminate the risk that the jury, if not apprised of that fact, erroneously will infer that no such prompt complaint was made." (*People v. Brown, supra*, 8 Cal.4th at p. 761.)

Defendant contends the trial court erred because it did not instruct the jury that the statements were being admitted for a non-hearsay purpose and could be considered only for the non-hearsay purposes of establishing the fact of the assault. The trial court, however, has no duty to instruct on the limited purpose for which the evidence is admitted unless the party requests the instruction. (*People v. Brown, supra,* 8 Cal.4th at p. 757; *People v. Manning* (2008) 165 Cal.App.4th 870, 880.) Defendant did not request an instruction to that effect.

Defendant asserts that the prosecutor in her closing arguments used the evidence for the truth of the matter asserted. Defendant, however, did not object to the prosecutor's argument and thus forfeited this contention. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1361-1362.)

Defendant also claims the statements should have been excluded because of their timing. But he also recognizes that "[t]he passage of time is not a decisive factor regarding the admission of fresh complaint statements." (*People v. Brown, supra*, 8 Cal.4th at p. 750.) And even if it was, not much time passed before Hazel made the complaints. She made her first statement to Wheatley approximately an hour and a half after she escaped defendant's apartment. Wheatley went to the hospital, where Hazel made two other statements to him. She made a fourth statement to him later that same day. The trial court did not abuse its discretion in admitting Wheatley's testimony of Hazel's complaints.

IV

*Prejudice*

Defendant contends that the trial court's evidentiary errors were prejudicial. We have determined the court erred only in admitting M.W.'s testimony in violation of her marital privilege not to testify. That error is prejudicial if it is reasonably probable the jury would have reached a result more favorable to defendant had the court excluded M.W.'s testimony. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

A more favorable verdict was not reasonably probable. Hazel explained what happened the night of the attack, and much of her testimony was corroborated. She testified that defendant kept her in his apartment against her will for approximately an hour and 15 minutes. During that time, he repeatedly hit her with his fist and with a gun. She escaped only after he went to the bathroom, but she left her purse behind. She hid in bushes near defendant's apartment. Later that morning, M.W. called Hazel to arrange to return Hazel's purse to her from defendant.

Text messages between Hazel and L.T. corroborated Hazel's testimony. Hazel texted that she could not speak then, presumably because defendant was looking for her. She told L.T. that defendant had hit her with a gun. When L.T. picked up Hazel, she saw Hazel run from the bushes to her car. Hazel was wearing only one shoe and was covered in dirt.

Hazel's and L.T.'s calls to 911 further indicated defendant had hit Hazel with a gun. Hazel only whispered so as not to be detected. Photos of her injures were shown to the jury. Additionally, the jury heard of Hazel's fresh complaint of the attack to Wheately. The jury also heard from Hazel and L.W. about defendant's history and propensity to physically abuse women with whom he had an intimate relationship.

Unlike Hazel's testimony, defendant's version of the incident was not as strongly corroborated. Defendant testified that Hazel started the altercation by punching him in

the chest when they argued after having sex. Defendant pushed her off the bed and onto the floor. She got up and charged him. He grabbed her right arm to stop her from swinging at him. A photo of Hazel's forearm appeared consistent with the area he grabbed. Holding her arm, he pushed her back into a dresser. She grabbed a toy and tried to hit him with it. He grabbed her arm again to stop her. That stopped the altercation. Defendant testified he only pushed her; he never punched her. He did not pull his gun out that night. He did not know how Hazel got the markings on her face.

Defendant's testimony does not explain why Hazel suffered injuries from being pistol whipped in the head. It does not explain why Hazel hid in the bushes outside defendant's apartment waiting for police and L.T. to help. Nor does it explain why Hazel asked L.T. to call the police for her and could not talk with L.T. as she hid from defendant.

Considering this evidence, we conclude it is not reasonably probable the jury would have reached a verdict more favorable for defendant had the trial court excluded M.W.'s testimony.

V

*Staying of Sentence for False Imprisonment Under Section 654*

Over defendant's objection, the trial court did not stay the sentence on the false imprisonment count under section 654. It determined the assault and the imprisonment were separate offenses with different objectives. The false imprisonment occurred when defendant used his body to push Hazel down the hall and into his bedroom. The assault and corporal injury were senseless violence that was severable from the imprisonment and occurred after defendant and Hazel had sex.

The court stated it would run the false imprisonment sentence consecutively to the assault sentence because the offenses were separate acts. The objective of the false

imprisonment was sex. The objective of the assault was punishment and retribution. The offenses also were not committed concurrently.

Defendant contends that the trial court erred when it did not stay his sentence for the false imprisonment count. Section 654 prohibits multiple punishments for the same act. He asserts that false imprisonment is a continuing offense, and here it overlapped with the assault. Defendant's restraint of Hazel continued up through the time he assaulted her. The two offenses involved the same act and the same criminal intent.

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. (See *Neal* [*v. State* (1960)] 55 Cal.2d [11,] 19; *People v. Beamon* (1973) 8 Cal.3d 625, 639.) We first consider if the different crimes were completed by a 'single physical act.' ([*People v.*] *Jones* [(2012)] 54 Cal.4th [350,] 358.) If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives. (*Id.* at p. 359; see also *People v. Mesa* (2012) 54 Cal.4th 191, 199 [] ['Our case law has found multiple criminal objectives to be a predicate for multiple punishment only in circumstances that involve, or arguably involve, multiple acts'].)" (*People v. Corpening* (2016) 2 Cal.5th 307, 311-312.)

" 'The proscription against double punishment in section 654 is applicable where there is a course of conduct which . . . comprises an indivisible transaction punishable under more than one statute . . . . The divisibility of a course of conduct depends upon

the intent and objective of the actor . . . .' [Citation.] 'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. [Citation.]' (*People v. Adams* (1982) 137 Cal.App.3d 346, 355.)" (*People v. Coleman* (1989) 48 Cal.3d 112, 162.)

We must uphold the trial court's determination that defendant's crimes for purposes of section 654 were separate and involved separate intents and objectives if substantial evidence supports the determination. (*People v. Kelly* (2018) 28 Cal.App.5th 886, 903.)

Substantial evidence supports the court's determination. Defendant's offenses involved a course of conduct during which he committed separate offenses with separate objectives. He tried to kiss Hazel and blocked her from leaving his apartment. He used his body to back her down the hall, into his bedroom, and onto the bed. He held her down on the bed with his forearm while he tried to take off her clothes. This was false imprisonment. His purpose of preventing Hazel from leaving was to have sex with her.

Once he fulfilled that objective, however, his demeanor "totally changed." Instead of pursuing sex, he put on his clothes, then yelled and ranted at Hazel and accused her of prostituting herself. He became so enraged that he hit her with his fist numerous times. Then he pointed a gun at her and hit her with it several more times. His objective in hitting her was obviously not to pursue sex. He sought to injure her, perhaps because she did not enjoy the sex, perhaps because she was dating someone else. Whatever the reason, it was not the same objective he had when he backed her into his bedroom.

Defendant claims the false imprisonment and the assault were the same act with the same intent because false imprisonment continued up through the time defendant assaulted Hazel with the firearm. Temporal proximity, however, is not the sole determinant of whether the course of conduct was indivisible. "[M]ultiple punishment also may be imposed where the defendant commits two crimes in pursuit of two

independent, *even if simultaneous*, objectives." (*People v. Douglas* (1995) 39 Cal.App.4th 1385, 1393-1394, italics added.) Multiple punishment based on a finding of "different, if simultaneous, intents . . . remains appropriate." (*People v. Latimer* (1993) 5 Cal.4th 1203, 1216.)

Defendant contends he has a due process right in the correct application of section 654 to his sentence. Assuming he does, any such right was not violated here. Substantial evidence supports the trial court's determination that defendant harbored separate intents and objectives when he falsely imprisoned Hazel and when he assaulted her with a semiautomatic firearm.

VI

*Use of Same Fact in Aggravation of Base Count and for the Enhancement*

Defendant claims the trial court improperly used dual facts when it sentenced him, resulting in two sentencing errors: (1) the court used the use of a firearm to impose the upper term for the assault with a firearm, but the firearm use was also an element of the assault offense; and (2) the court imposed the upper term for the assault offense without first striking the firearm enhancement.

Defendant correctly acknowledges that this claim is forfeited because defense counsel did not object to the sentence at trial. (*People v. Scott* (1994) 9 Cal.4th 331, 353.) However, defendant argues that we should address the error on the merits in order to avoid a claim of ineffective assistance of counsel in habeas proceedings.

In order to demonstrate ineffective assistance of counsel, defendant must first show his counsel's performance was "deficient" because counsel's "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674].) Defendant cannot make this showing because any objection by counsel would have been futile. The trial court did not err.

The California Rules of Court provide our answer. Rule 4.420(d) prohibits a court from using a fact which is an element of the convicted offense to impose a particular term. And rule 4.420(c) authorizes a court to use a fact charged and found as an enhancement as the reason for imposing a particular term only if the court strikes the enhancement. Thus, had the court relied *solely* on defendant's firearm use—a fact that was an element of the assault offense and a separate enhancement which the court did not strike—to impose the upper term on the assault offense, the court would have erred.

The court, however, did not rely just on defendant's firearm use to impose the upper term and not strike the enhancement. It also relied on the following factors:

"The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness;"

"The defendant has engaged in violent conduct that indicates a serious danger to society;" and

"The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness[.]" (Cal. Rules of Court, rule 4.421(a)(1), (b)(1), (2).)

The court needed only a single aggravating factor other than defendant's firearm use to impose the upper term and not strike the enhancement. (*People v. Osband* (1996) 13 Cal.4th 622, 728.) Here, it found three additional aggravating factors.

Because counsel's decision not to object to this aspect of the sentence was not deficient, counsel did not render ineffective assistance to defendant.

DISPOSITION

The judgment is affirmed.

_____
HULL, J.

We concur:

_____
RAYE, P. J.

_____
MURRAY, J.