[No. B152000. Second Dist., Div. One. Nov. 7, 2001.]

SUSAN JURCOANE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

Counsel

Law Offices of Robert Berke, Joseph A. Pertel and Robert Berke for Petitioner.

No appearance for Respondent.

Steve Cooley, District Attorney, Patrick D. Moran and Patricia Martinez, Deputy District Attorneys, for Real Party in Interest.

Opinion

**ORTEGA, Acting P. J.**—Susan Jurcoane sought review of an order denying her marital privilege claim (Evid. Code, §§ 970-973)[1] and requiring her to testify at a preliminary hearing to be conducted to determine whether her husband, Josif Jurcoane, committed two 1984 murders. We stayed Susan's participation in any preliminary hearing and issued an order to show cause.

The issue is whether Susan may claim the marital testimonial privilege so that she need not testify against Josif. Josif fled California immediately after the killings and was charged a few days later. Susan and Josif never divorced and remain legally married. Susan had no contact with Josif for the 17 years since the killings. The magistrate overruled Susan's privilege claim. Relying primarily on federal cases interpreting the Federal Rules of Evidence, the magistrate determined the marital privilege does not apply where a viable marital relationship no longer exists.

We conclude the California marital privilege contains no such limitation, which cannot be created by judicial interpretation. Only the Legislature could choose to add such an exception to the existing express statutory marital privilege exceptions listed in section 972. Thus, we grant Susan's petition and issue a writ ordering the magistrate to issue a new order upholding Susan's exercise of the marital privilege and preventing the People from calling her as a witness at any criminal proceedings against Josif so long as she continues to exercise the privilege and the couple remains married.

FACTS

Susan and Josif were married on August 28, 1976, in New Jersey. They never divorced. The couple later moved to California. On July 4, 1984,

---

[1]All further undesignated section references are to the Evidence Code.

Lloyd Bryden and Alice McCannel were killed. On July 12, 1984, a felony complaint was issued charging Josif with murdering Bryden and McCannel. (Pen. Code, § 187, subd. (a).)

According to Josif's statement at an April 2001, Mexican deportation proceeding, Josif fled to Mexico shortly after the killings and before any proceedings occurred. In the statement, Josif admitted working for Bryden. Josif claimed another man stole Josif's firearms and killed the victims with one of them. Josif heard the shots, confronted the shooter, took his gun back, and ran from the scene. Josif feared he would be implicated because his gun was the murder weapon, so he told Susan what had happened and left for Mexico. In Mexico, he assumed a false name, claimed Mexican citizenship, resumed his auto mechanic work, and lived with a Mexican woman. Josif was arrested on drug charges in Mexico shortly before the Mexican hearing, and was returned to California when the Los Angeles County District Attorney told Mexican authorities he would not seek the death penalty.[2]

On May 17, 2001, the prosecution subpoenaed Susan to appear as a witness at Josif's preliminary hearing. After several continuances the preliminary hearing was set for July 20, 2001.

At the July 20 hearing, the magistrate ordered an in camera hearing when apprised that Susan was a principal witness against Josif and would assert the marital privilege. The parties agreed that Susan and Josif had been married August 28, 1976, had never been divorced, and had had no contact since shortly after the July 4, 1984, killings. The prosecutor also made an unchallenged offer of proof that Josif fled the country the day of the shooting and had not seen Susan from that date until the pending court proceedings. ██ ██ The prosecutor continued, again without objection: "There w[ere] some phone calls that were attempted by [Josif] early on after he left, but there's been no conversation other than those early on phone calls. And also there has been absolutely no economic help by [Josif]."[3]

---

[2]Josif's statement during the Mexican deportation proceedings, and the district attorney's declination to seek the death penalty, were attached as exhibits to the People's return to Susan's writ petition. Neither the documents nor a related offer of proof was presented to the magistrate. Susan objects to our considering the documents, noting they are not certified copies, are otherwise hearsay, and she has not yet had a chance to challenge them. We do not consider the facts contained in the documents proven, but note they demonstrate some documentary support for the prosecutor's offer of proof to the magistrate. Other than the Jurcoanes' marriage certificate, and Susan's orally confirming the magistrate's inquiry, already stipulated to by the parties, that she had had no contact with Josif for the 17 years since the killings, the hearing was conducted on unchallenged offers of proof.

[3]As noted, no one objected to the prosecutor's offer of proof. For the first time in her traverse, Susan, represented in these writ proceedings by the same counsel as in the trial

Susan, represented by counsel, asserted the privilege not to be called as a witness. Susan argued the California marital privilege contained express statutory exceptions (§ 972), which did not include whether the marital relationship was intact when one spouse asserted the privilege. Susan argued any additional exception could be created only by the Legislature and not by judicial interpretation of the Evidence Code.

The prosecutor argued that the privilege was designed to preserve intact marriages, which the Jurcoanes no longer had, and that federal cases held the privilege should be narrowly construed and did not apply in similar situations.

The magistrate overruled Susan's assertion of the privilege and held she should testify, explaining: "[W]ith respect to [Susan's] being called as a witness, it appears to the court that there is no marriage in the sense of a real marriage between these parties; and that the privilege should not stand as a bar in this particular case. And therefore, the assertion of the privilege will be denied in this case[, w]ith respect to [Susan] being called as a witness." Later, the magistrate elaborated: "[T]here essentially is no marriage. I mean, the word 'marriage,' we always have to interpret and the evidence seems clear there is not a marriage here except in name only." The magistrate continued the hearing before Susan was sworn to permit her to seek review.

DISCUSSION

The magistrate found that, despite their never having been divorced, the Jurcoanes no longer had a viable, extant marital relationship. As a result, the magistrate concluded Susan could not claim the marital testimonial privilege, although the couple legally remained married. Although she does not dispute the magistrate's factual findings, Susan contends the trial court erred in overruling her marital privilege claim. She argues the privilege and its exceptions were enacted by the Legislature as part of our comprehensive Evidence Code. Standard statutory construction rules, undisputed by the People, compel courts to follow express and unambiguous statutory language in interpreting the marital privilege and its exceptions, and prevent California courts from engaging in common law development of additional

court, objected to our considering the offer of proof. We deny this untimely objection because failure to object in the trial court waives any challenge to the evidence on review. "It is well settled by statute and case authority that the failure to object, even to otherwise inadmissible evidence, waives the defect. [Citations.] [¶] . . . The failure to raise [a] specific objection . . . waives such argument for purposes of appeal. (Evid. Code, § 353, subd. (a).)" (*Haskell v. Carli* (1987) 195 Cal.App.3d 124, 129 [240 Cal.Rptr. 439]; see 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 371, pp. 459-460.) Moreover, as noted, the in camera hearing was primarily conducted using offers of proof.

definitions and exceptions. Susan argues that, because the Legislature did not include a "marital viability" exception to the express marital privilege exceptions listed in section 972, the magistrate erred in creating it. While federal courts, interpreting federal rules, are expressly permitted to engage in common law development of privileges and exceptions, Susan argues our statutory scheme does not so permit.

Susan's contention has merit.

■ "The interpretation of a statute . . . is a question of law . . . ." (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].) " 'Interpretation and applicability of a statute or ordinance is clearly a question of law.' [Citation.] It is the duty of an appellate court to make the final determination from the undisputed facts and the applicable principles of law. [Citation.]" (*Sutco Construction Co. v. Modesto High School Dist.* (1989) 208 Cal.App.3d 1220, 1228 [256 Cal.Rptr. 671].) Thus, we interpret sections 970-973 de novo as a matter of law.

■ In interpreting statutes, our primary goal is to give effect to the Legislature's intent in enacting the law. " 'To determine intent, " 'The court turns first to the words themselves for the answer.' " ' [Citation.]" (*In re Littlefield* (1993) 5 Cal.4th 122, 130 [19 Cal.Rptr.2d 248, 851 P.2d 42].) "If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citations.]" (*People v. Knowles* (1950) 35 Cal.2d 175, 183 [217 P.2d 1].)

Statutory interpretation involves a three-step analysis. "First, a court should examine the actual language of the statute. [Citations.] Judges, lawyers and laypeople all have far readier access to the actual laws enacted by the Legislature than the various and sometimes fragmentary documents shedding light on legislative intent. More significantly, it is the language of the statute itself that has successfully braved the legislative gauntlet. It is that language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed 'into law' by the Governor. The same care and scrutiny does not befall the committee reports, caucus analyses, authors' statements, legislative counsel digests and other documents which make up a statute's 'legislative history.'

"In examining the language, the courts should give to the words of the statute their ordinary, everyday meaning [citations] unless, of course, the

statute itself specifically defines those words to give them a special meaning [citations]).

"If the meaning is without ambiguity, doubt, or uncertainty, then the language controls. [Citations.]

"But if the meaning of the words is not clear, courts must take the second step and refer to the legislative history. [Citations.]

"The final step—and one which we believe should only be taken when the first two steps have failed to reveal clear meaning—is to apply reason, practicality, and common sense to the language at hand. If possible, the words should be interpreted to make them workable and reasonable [citations]." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238-1240 [8 Cal.Rptr.2d 298].)

We apply these undisputed rules to our review of sections 970-973.

■ We must read statutes as a whole, giving effect to all their provisions, neither reading one section to contradict others or its overall purpose, nor reading the whole scheme to nullify one section. "The rules governing statutory construction are well established. Our objective is to ascertain and effectuate legislative intent. [Citations.] . . . In this regard, all parts of a statute should be read together and construed in a manner that gives effect to each, yet does not lead to disharmony with the others. [Citations.]" (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 468 [14 Cal.Rptr.2d 514, 841 P.2d 1034].) "[L]egislation must be construed as a whole while avoiding an interpretation which renders any of its language surplusage. [Citation.]" (*Ibid.*)

■ *If statutory language is ambiguous, and only then,* we must construe statutes to ensure reasonable, not absurd, results, consistent with overall legislative intent. "*When uncertainty arises in a question of statutory interpretation,* consideration must be given to the consequences that will flow from a particular interpretation. [Citation.] In this regard, it is presumed the Legislature intended reasonable results consistent with its expressed purpose, not absurd consequences. [Citations.] ' "[*W*]*here the language of a statutory provision is susceptible of two constructions,* one of which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted." ' [Citation.]" (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1165-1166 [278 Cal.Rptr. 614, 805 P.2d 873], italics added.)

■ Where the Legislature makes express statutory distinctions, we must presume it did so deliberately, giving effect to the distinctions, unless the whole scheme reveals the distinction is unintended. This concept merely restates another statutory construction canon: we presume the Legislature intended everything in a statutory scheme, and we should not read statutes to omit expressed language or include omitted language. As our Supreme Court stated, "we are aware of no authority that supports the notion of legislation by accident." (*In re Christian S.* (1994) 7 Cal.4th 768, 776 [30 Cal.Rptr.2d 33, 872 P.2d 574].)

■ As noted, the marital testimonial privilege at issue here is contained in sections 970-973. Section 970 states: "Except as otherwise provided by statute, a married person has a privilege not to testify against his spouse in any proceeding." Under this section, Susan has a privilege not to testify against Josif in this or any proceeding. (Section 901 defines "Proceeding" as "any action, hearing, investigation, inquest, or inquiry . . . in which, pursuant to law, testimony can be compelled to be given." Section 903, subdivision (a) defines "Criminal proceeding" to include a "criminal action.")

Section 971 states: "Except as otherwise provided by statute, a married person whose spouse is a party to a proceeding has a privilege not to be called as a witness by an adverse party to that proceeding without the prior express consent of the spouse having the privilege under this section unless the party calling the spouse does so in good faith without knowledge of the marital relationship." This section prevents the prosecution from calling Susan as a witness.

Section 972 expressly lists the exceptions to the privilege.[4] Section 972 does not contain an exception for marriages where the parties have not lived

---

[4]Section 972 provides: "A married person does not have a privilege under this article in:

"(a) A proceeding brought by or on behalf of one spouse against the other spouse.

"(b) A proceeding to commit or otherwise place his or her spouse or his or her spouse's property, or both, under the control of another because of the spouse's alleged mental or physical condition.

"(c) A proceeding brought by or on behalf of a spouse to establish his or her competence.

"(d) A proceeding under the Juvenile Court Law, Chapter 2 (commencing with Section 200) of Part 1 of Division 2 of the Welfare and Institutions Code.

"(e) A criminal proceeding in which one spouse is charged with:

"(1) A crime against the person or property of the other spouse or of a child, parent, relative, or cohabitant of either, whether committed before or during marriage.

"(2) A crime against the person or property of a third person committed in the course of committing a crime against the person or property of the other spouse, whether committed before or during marriage.

"(3) Bigamy.

"(4) A crime defined by Section 270 or 270a of the Penal Code [child neglect].

"(f) A proceeding resulting from a criminal act which occurred prior to legal marriage of the spouses to each other regarding knowledge acquired prior to that marriage if prior to the

together for a certain time, or where the marriage, while still legally extant, is no longer viable or intact.

Section 973, subdivision (a) provides that married persons can waive this privilege by testifying, unless erroneously compelled to do so, (1) in proceedings to which their spouses are parties, or (2) against their spouses.

Section 911 provides that privileges exist only as defined by statute: "*Except as otherwise provided by statute*: [¶] (a) No person has a privilege to refuse to be a witness. [¶] (b) No person has a privilege to refuse to disclose any matter or to refuse to produce any writing, object, or other thing. [¶] (c) No person has a privilege that another shall not be a witness or shall not disclose any matter or shall not produce any writing, object, or other thing." (Italics added.)

■ "Privileges should be narrowly construed since they prevent the admission of relevant and otherwise admissible evidence." (*People v. McGraw* (1983) 141 Cal.App.3d 618, 622 [190 Cal.Rptr. 461].) However, this statement is merely a subset of the larger rule that privileges and their exceptions are statutory creations which cannot be altered by judicial interpretation. "[T]he Legislature has determined that evidentiary privileges shall be available only as defined by statute. (. . . § 911.) Courts may not add to the statutory privileges except as required by state or federal constitutional law [citations], *nor may courts imply unwritten exceptions to existing statutory privileges.* [Citations.]" (*Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 373 [20 Cal.Rptr.2d 330, 853 P.2d 496], italics added.) Our Supreme Court recently reaffirmed this rule: "The privileges set out in the Evidence Code are legislative creations; the courts of this state have no power to

---

legal marriage the witness spouse was aware that his or her spouse had been arrested for or had been formally charged with the crime or crimes about which the spouse is called to testify.

"(g) A proceeding brought against the spouse by a former spouse so long as the property and debts of the marriage have not been adjudicated, or in order to establish, modify, or enforce a child, family or spousal support obligation arising from the marriage to the former spouse; in a proceeding brought against a spouse by the other parent in order to establish, modify, or enforce a child support obligation for a child of a nonmarital relationship of the spouse; or in a proceeding brought against a spouse by the guardian of a child of that spouse in order to establish, modify, or enforce a child support obligation of the spouse. The married person does not have a privilege under this subdivision to refuse to provide information relating to the issues of income, expenses, assets, debts, and employment of either spouse, but may assert the privilege as otherwise provided in this article if other information is requested by the former spouse, guardian, or other parent of the child.

"Any person demanding the otherwise privileged information made available by this subdivision, who also has an obligation to support the child for whom an order to establish, modify, or enforce child support is sought, waives his or her marital privilege to the same extent as the spouse as provided in this subdivision."

expand them *or to recognize implied exceptions.* [Citing *Roberts.*]" (*Wells Fargo Bank v. Superior Court* (2000) 22 Cal.4th 201, 206 [91 Cal.Rptr.2d 716, 990 P.2d 591], italics added.) Neither below nor here did the People argue their proposed exception to the marital testimonial privilege was constitutionally compelled. Thus, we deal here only with statutory, not constitutional, interpretation.

The Legislature has addressed marriage in other statutes. "Marriage is a personal relation arising out of a civil contract between a man and a woman, to which the consent of the parties capable of making that contract is necessary. Consent alone does not constitute marriage. Consent must be followed by the issuance of a license and solemnization as authorized by this division . . . ." (Fam. Code, § 300.) Moreover, the Legislature has also defined how marriages can be dissolved: "Marriage is dissolved *only* by one of the following: [¶] (a) The death of one of the parties. [¶] (b) A judgment of dissolution of marriage. [¶] (c) A judgment of nullity of marriage." (Fam. Code, § 310, italics added.)

"Unquestionably, the Legislature has full control of the subject of marriage and may fix the conditions under which the marital status may be created or terminated, as well as the effect of an attempted creation of that status. [Citation.]" (*McClure v. Donovan* (1949) 33 Cal.2d 717, 728 [205 P.2d 17].)

"Sections 970 and 971 deal with the privilege of a spouse not to be a witness against his will against the other spouse. This privilege is above and beyond the privilege not to disclose privileged [marital] communications. [(§§ 980-987.)] It is individual to the spouse called as a witness and may not be claimed by the spouse against whom the testimony is offered. . . . [¶] The marital privilege does not exist as to observations, such as mental condition, where the parties are separated by divorce. [Citation.] *Since sections 970 and 971 are each couched in the present tense, it is clear that the privilege of not being a witness against a spouse does not exist after the marital relationship is terminated by divorce.* [Citation.]" (*People v. Dorsey* (1975) 46 Cal.App.3d 706, 716-717 [120 Cal.Rptr. 508], italics added.)

In *Dorsey*, the defendant's wife testified against Dorsey for the prosecution without interposing the privilege. At the time of her testimony, the wife said "she and Dorsey were going through a divorce proceeding and that she thought that the decree was 'final.' " (*People v. Dorsey, supra,* 46 Cal.App.3d at p. 709, fn. 1.) *Dorsey* held Dorsey's attorney was not incompetent for failing to raise the marital testimonial privilege under sections 970-971 (although he was incompetent for not raising other privileges)

because "if at the time she testified Mrs. Dorsey had obtained a final decree of divorce she was competent to be a witness against Dorsey as to observations and facts which occurred during the marriage. If no such final decree had been obtained, she and she alone could claim a privilege not to be a witness. No such claim of privilege was made." (*People v. Dorsey, supra,* 46 Cal.App.3d at p. 717.) Although the issue before us was not raised in *Dorsey,* the court assumed the bright line of divorce was necessary to terminate the marital testimonial privilege.

 Thus, the statutes defining the marital testimonial privilege facially do not include a proposed exception to the privilege where a still legally intact marriage is "moribund," "abandoned," or "no longer viable." The Legislature granted the privilege to witnesses who were married when compelled to testify. The Legislature created a list of express exceptions, and chose not to create the People's proposed exception. This statutory scheme facially cannot be read to include the People's proposed exception. Section 911 and *Wells Fargo Bank v. Superior Court, supra,* 22 Cal.4th at page 206, prohibit us from creating it.

Cases have consistently rejected various attempts to judicially change the privilege or its exceptions, where the statutory term is clear on its face or has been defined by statute. (*People v. Bogle* (1995) 41 Cal.App.4th 770, 781-783 [48 Cal.Rptr.2d 739] [cohabitant exception]; *People v. Siravo* (1993) 17 Cal.App.4th 555, 560-563 [21 Cal.Rptr.2d 350] [same]; *People v. Resendez* (1993) 12 Cal.App.4th 98, 104-111 [15 Cal.Rptr.2d 575] [waiver of privilege under § 973].)

The People's reliance on *Dunn v. Superior Court* (1993) 21 Cal.App.4th 721 [26 Cal.Rptr.2d 365] is unavailing. *Dunn* looked to other statutes and some non-California cases to decide if a foster child was included in the crime-against-a-child exception in section 972. Relying primarily on California statutes and cases, as well as some out-of-state authority, *Dunn* decided the exception applied to foster children. *Dunn* does not stand for the proposition that courts may change facially clear statutory privileges by adding additional exceptions to those listed by the Legislature in section 972.

The 1965 California Law Revision Commission comment explains the history and purpose of section 970: "Under this article, a married person has two privileges: (1) a privilege not to testify against his spouse in any proceeding (Section 970) and (2) a privilege not to be called as a witness in any proceeding to which his spouse is a party (Section 971). [¶] The

privileges under this article are not as broad as the privilege provided by existing law. Under existing law, a married person has a privilege to prevent his spouse from testifying against him, but only the witness spouse has a privilege under this article. Under the existing law, a married person may refuse to testify *for* the other spouse, but no such privilege exists under this article. . . . [¶] The rationale of the privilege provided by Section 970 not to testify against one's spouse is that such testimony *would seriously disturb or disrupt the marital relationship.* Society stands to lose more from such disruption than it stands to gain from the testimony which would be available if the privilege did not exist." (Cal. Law Revision Com. com., 29B pt. 3 West's Ann. Evid. Code (1995 ed.) foll. § 970, p. 258, italics added.)

The People, relying on this Law Revision Commission comment, argue the Legislature did not intend that a spouse whose marriage was abandoned for 17 years be able to assert the marital privilege. However, no matter how convincing the People's policy argument is, we cannot indulge it without first finding this statutory scheme vague and equivocal. As discussed above, this statutory scheme is facially clear.

Below and in this writ proceeding, the People relied on federal cases. Federal courts have held there is no privilege if the parties entered into the marriage for the sole purpose of invoking the privilege. (See, e.g., *United States v. Saniti* (9th Cir. 1979) 604 F.2d 603, 604 [affirming conviction partially based on wife's compelled testimony; trial court properly overruled wife's invocation of marital privilege where marriage was " 'entered into for the purpose of invoking the marital privilege' " (*ibid.*, fn. 1)]; *United States v. Apodaca* (10th Cir. 1975) 522 F.2d 568, 571 [same].)

Unlike the California statutory scheme discussed above, federal rules provide an extremely broad exception to privileges. Rule 501 of the Federal Rules of Evidence (28 U.S.C.) (all further undesignated rule references are to the Federal Rules of Evidence) expressly states that, except as otherwise required by the United States Constitution, federal statutes, or federal court rules, privileges are "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

The United States Supreme Court has stated, in reference to recognizing a psychotherapist-patient privilege: "Rule 501 . . . authorizes federal courts to define new privileges by interpreting 'common law principles . . . in the light of reason and experience.' . . . The Rule thus did not freeze the law governing the privileges of witnesses in federal trials at a particular point in

our history, but rather directed courts to 'continue the evolutionary development of testimonial privileges.' [Citation.]" (*Jaffee v. Redmond* (1996) 518 U.S. 1, 8-9 [116 S.Ct. 1923, 1027-1928, 135 L.Ed.2d 337].)

Federal courts have used rule 501 to narrow the marital testimonial privilege. In *Trammel v. United States* (1980) 445 U.S. 40 [100 S.Ct. 906, 63 L.Ed.2d 186], the United States Supreme Court determined that a husband could not prevent his wife, who had been granted immunity, from testifying against him. The United States Supreme Court reviewed the history of the privilege: "Writing in 1628, Lord Coke observed that 'it hath beene resolved by the Justices that a wife cannot be produced either against or for her husband.' [Citations.] This spousal disqualification sprang from two canons of medieval jurisprudence: first, the rule that an accused was not permitted to testify in his own behalf because of his interest in the proceeding; second, the concept that husband and wife were one, and that since the woman had no recognized separate legal existence, the husband was that one. From those two now long-abandoned doctrines, it followed that what was inadmissible from the lips of the defendant-husband was also inadmissible from his wife.

"Despite its medieval origins, this rule of spousal disqualification remained intact in most common-law jurisdictions well into the 19th century. [Citation.] . . . . [I]t was not until 1933, in *Funk v. United States*, 290 U.S. 371 [54 S.Ct. 212, 78 L.Ed. 369, 93 A.L.R. 1136], that this Court abolished the testimonial disqualification in the federal courts, so as to permit the spouse of a defendant to testify in the defendant's behalf. *Funk*, however, left undisturbed the rule that either spouse could prevent the other from giving adverse testimony. [Citation.] The rule thus evolved into one of privilege rather than one of absolute disqualification. [Citation.]

"The modern justification for this privilege against adverse spousal testimony is its perceived role in fostering the harmony and sanctity of the marriage relationship." (*Trammel v. United States, supra,* 445 U.S. at pp. 43-44 [100 S.Ct. at p. 909].)

The United States Supreme Court further explained: "[T]he long history of the privilege suggests that it ought not to be casually cast aside. That the privilege is one affecting marriage, home, and family relationships—already subject to much erosion in our day—also counsels caution. At the same time, we cannot escape the reality that the law on occasion adheres to doctrinal concepts long after the reasons which gave them birth have disappeared and after experience suggests the need for change." (*Trammel v. United States, supra,* 445 U.S. at p. 48 [100 S.Ct. at p. 911].)

"Testimonial exclusionary rules and privileges contravene the fundamental principle that ' "the public . . . has a right to every man's evidence." ' [Citation.] As such, they must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.' [Citations.] Here we must decide whether the privilege against adverse spousal testimony promotes sufficiently important interests to outweigh the need for probative evidence in the administration of criminal justice." (*Trammel v. United States, supra,* 445 U.S. at pp. 50-51 [100 S.Ct. at p. 912].)

"The contemporary justification for affording an accused such a privilege is also unpersuasive. When one spouse is willing to testify against the other in a criminal proceeding—whatever the motivation—their relationship is almost certainly in disrepair; there is probably little in the way of marital harmony for the privilege to preserve. In these circumstances, a rule of evidence that permits an accused to prevent adverse spousal testimony seems far more likely to frustrate justice than to foster family peace." (*Trammel v. United States, supra,* 445 U.S. at p. 52 [100 S.Ct. at p. 913], fn. omitted.)

The Supreme Court concluded: "Our consideration of the foundations for the privilege and its history satisfy us that 'reason and experience' no longer justify so sweeping a rule . . . . Accordingly, we conclude that the existing rule should be modified so that the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying. This modification—vesting the privilege in the witness-spouse—furthers the important public interest in marital harmony without unduly burdening legitimate law enforcement needs." (*Trammel v. United States, supra,* 445 U.S. at p. 53 [100 S.Ct. at p. 914].)

Whether the federal scheme under rule 501 has merit or not, California law does not permit that approach. Although Susan had not seen her husband in the 17 years since the murders with which he was charged, and her assertion of the privilege may deprive the People of crucial evidence in a double murder case, we conclude it is for the Legislature to create an additional exception to the privilege, after weighing the effects on the numerous other statutes affecting marital rights.

Thus, we conclude the magistrate erred in overruling Susan's privilege claim.

### DISPOSITION

We grant Susan's petition. We issue a writ directing the magistrate to vacate the earlier order overruling Susan's privilege claim, and issue a new

order preventing her from being called as a witness in this case so long as she remains married to Josif and chooses to exercise the privilege.

Vogel (Miriam A.), J., and Mallano, J., concurred.