Filed 1/30/26  P. v. Bedford CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

<table>
<tr><td>

THE PEOPLE,

    Plaintiff and Appellant,

v.

DARRIN DEMONT BEDFORD et al.,

    Defendants and Respondents.

</td><td>

H051908
(Santa Clara County
Super. Ct. No. C2301164)

</td></tr>
</table>

On preliminary examination of the evidence in this kidnapping and robbery prosecution, the magistrate declined to hold defendants Darrin Demont Bedford, Kennith Martin, Jr., Orlando Anthony Oliva, and Paris Dayvon Williams to answer for gang enhancements alleged under Penal Code section 186.22[1] and gang-related firearm enhancements alleged under section 12022.53, subdivisions (d) and (e)(1).  When the Santa Clara County District Attorney included these enhancements in the operative information, the superior court granted in part defendants' section 995 motion, striking the enhancements.  On this prosecution's appeal, we affirm the order granting the section 995 motion, finding insufficient evidence to raise a strong suspicion that the predicate offenses commonly benefited the gang or that the gang members collectively engaged in a pattern of criminal gang activity.

_____

[1] Unspecified statutory references are to the Penal Code.

# I.   BACKGROUND

## A.   *The Second Amended Complaint*

In August 2023, the district attorney filed a second amended complaint charging defendants Bedford, Martin, Oliva, Williams, and another codefendant, Freddy Ray McCardie, III,[2] with kidnapping to commit robbery (§ 209, subd. (b)(1); count 1), assault with a firearm (§ 245, subd. (a)(2); count 2), five counts of second degree robbery (§ 211; counts 3 through 7), buying or receiving stolen property in excess of $950 (§ 496, subd. (a); count 8), and carjacking (§ 215, subd. (a); count 9). As to all counts except count 8, it was alleged that the defendants committed the offenses for the benefit of a criminal street gang, identified as Bossland Baby, as defined under section 186.22, subdivision (b). As to the kidnapping and robbery counts, the complaint also alleged gang-related firearm enhancements (§ 12022.53, subds. (d) & (e)(1)).

## B.   *The Preliminary Hearing*

### 1.   *The Offenses*

The charged offenses relate to a robbery of the San Jose Camera store in Campbell, California, on January 25, 2023, and an earlier carjacking of the vehicle in which the suspects fled the robbery.

That day, several masked men with guns entered the camera store around 11:00 a.m. and ordered the employees to the ground. Store co-owner Christopher Cismondi, who arrived as the robbery was underway, tried to leave, but one of the robbers pulled him inside the store, where he too was ordered to lie on the floor. After the men left, Christopher's brother and store co-owner Michael Cismondi ran outside with a gun that Christopher kept inside the store. Christopher went after Michael, heard someone yelling that there was a gun, then heard gunshots. Michael fell to the ground, and the suspects

---

[2] McCardie, named in the complaint, was neither party to the preliminary hearing nor charged in the information.

sped away in a white SUV with what was approximated to be $50,000 in store merchandise.

The white SUV was later found parked in Oakland. The Oakland Police Department had separately been investigating defendants Williams and Bedford for another robbery and had a search warrant for two associated houses, one in Oakland and another in San Leandro. At the San Leandro house, officers recovered multiple boxes bearing "San Jose Camera" stickers. Officers also found two boxed drones bearing "Mike's Camera" stickers at the Oakland house. All four defendants and McCardie were detained at the San Leandro house. McCardie and Martin were wearing shoes that resembled those worn by two suspects seen in San Jose Camera surveillance video.

Officers found a key for the white SUV in Oliva's pocket. The registered owner of the SUV reported that she had been carjacked at gunpoint in Oakland two days before the San Jose Camera robbery. She recalled that a dark Acura sedan had pulled up before the carjacking. Bedford was known to own a black Acura sedan.

The SUV's windows had been tinted after it was stolen. Phone records placed the four defendants' phones near a tint shop the day before the robbery. Surveillance photographs and videos showed a masked person near the white SUV enter the tint store. Oakland Police Officer Forest Klein identified Bedford and someone he believed to be McCardie in surveillance videos outside the tint store.

Bedford's cell phone records showed his phone traveling south toward Campbell then back north toward Oakland on the morning of the San Jose Camera robbery. Williams's phone traveled in a similar direction.

2. *Predicate Offenses*

In December 2022, the manager of a Mike's Camera store in Dublin reported that a group of masked and hooded men armed with guns had robbed the store of around $70,000 in merchandise.

3

And in January 2023, five suspects robbed a Pleasant Hill Mike's Camera store of about $85,000 in merchandise. The suspects had guns and drove an Acura sedan.

Klein identified Martin as one of the perpetrators in both the December 2022 and January 2023 robberies. But no prosecutions were pursued in either case.

### 3. *Gang Testimony*

The prosecution first called Oakland Police Officer Jesus Iniguez to testify as an expert on the Bossland Baby (BLB) subset, but on defendants' voir dire of the officer, the magistrate "in good conscience, [did] not feel comfortable allowing [Iniguez] to testify as an expert." The prosecution then recalled Klein to testify about Oakland gangs.[3] Although the prosecutor opined that it was unnecessary to proffer either Klein or Iniguez as experts, the trial court over defense objection permitted Klein to testify about Oakland gangs, including the Case gang and its subset BLB.

Klein testified that he was assigned to the Ceasefire section (the gang unit) of the Oakland Police Department. At the police academy, he received a day of training on the primary gangs in Oakland, including the Case gang and Ed Nario Taliban (ENT): He learned that members of the Case gang typically commit homicides, robberies, and shootings. Klein had interacted "no less than 20 times" with people he suspected—based on tattoos, locales, and conversations with senior officers—were Case gang members. As a patrol officer, Klein had made two robbery arrests involving suspected Case gang members but did not "conduct a full gang investigation as part of those arrests." Since joining the gang unit, Klein had been involved in no less than 30 "long-term gang investigations[4] . . . specific to the Case [g]ang" or its subsets, ranging from firearm

___

[3] Iniguez in voir dire had identified a third officer as "the go-to person" in his unit for gang-related expertise. The magistrate suggested to the prosecutor that this other officer "seems like . . . the guy that knows what's going on."

[4] Asked what constituted a long-term gang investigation, Klein said: "Our investigations will start with a crime of which we believe is gang motivated or has a gang

4

possession to attempted homicide. Klein had previously arrested Bedford in 2019 for a robbery related to the Case gang, and Bedford was subsequently convicted of robbery.

According to Klein, the Case gang (originally called the Nut Case gang) formed in 2002 or 2003. The Case gang's main rivals are the ENT gang and FE gang, and Case members will taunt, rob, or attempt to shoot rival gang members if they encounter them. The Case gang has several subsets, including BLB, but has no hierarchy and no designated leaders. Klein described the subsets as "self-independent" and "self-running" cells that can be in competition and have rivalries with each other, even if the subsets all fall within the "Case [g]ang umbrella." The Case gang had common signs and symbols including the use of the number 4, or the Planters brand Mr. Peanut logo, or peanut M&Ms. Membership does not require initiation: People become a part of the gang based on where they live, where they grew up, or who their friends are, or they may become members by otherwise being found trustworthy.

When members of BLB commit robberies together, Klein's understanding was that "the proceeds are . . . somehow divided between those group members" who "actually performed the act." "[T]hat group would . . . democratically decide how to split up the money." And on cross-examination, Klein agreed that robbery proceeds were "divvied up or divided amongst each individual member, each individual person based upon . . . the work they put in." Proceeds are not always divided equally among participating members: If "somebody does more, or somebody does less, there is the possibility of them divvying it up differently." And if "a much more well-respected gang member . . . commissioned that crime," then that gang member "may get more or less, depending on the circumstances of . . . [the] crime that they participated in." According to Klein, criminal proceeds are not expended on gang taxes, because Case has no gang

member as a victim, and we will investigate those crimes and try to determine if another gang had committed that crime, and if so, hopefully -- or locate and arrest those people and get them convicted of crimes over a long period of time."

5

tax system or money going into prisons: "[T]here is no money[-]sharing up the organizational ladder or to the larger [C]ase umbrella as far as we're aware of." If members of different Case subsets commit crimes together—for example, BLB members might commit crimes with members of Fien Team—the money is shared between those who committed the crime and "can go back to that gang, the gang members in each subset."

When discussing BLB's structure, Klein opined that BLB was an "organized group with some form of structure." But the structure was not hierarchical. Instead, "everybody has equal say in this group and its direction and its goals, the goals in which this group is to commit certain crimes." Thus, "each member that commits those crimes gets equal profit or somehow divvies it up within their own group." There is no designated disciplinary system within the gang.

Klein opined that the BLB subset formed sometime in 2021. BLB was an "informal group" with no written laws or rules and no particular leader, though there were members who were more influential than others. Since 2022, Klein had been a secondary investigator in several BLB investigations, two for firearm possession and one for robbery. In 2019, Klein arrested Bedford for robbery in a case involving Case members, and Klein knew that Bedford had been convicted of robbery following that offense. Klein estimated that there were about a dozen members of BLB, and there were several street names that comprise the "BOSS" acronym of the subset's name. But BLB members do not need to come from any specific location, and members can live anywhere between Oakland and Hayward "if necessary." BLB members were almost all African-American, but there is no strict requirement that BLB members must be of a certain race. BLB had its own common signs and symbols that differed from those generally used by the Case gang, including the numbers 9 and 6, or just generally the letters "BLB." BLB was heavily aligned with the Fien Team, and the Fien Team spun off

6

as a Case gang subset in 2020.  The two subsets have overlapping territories and maintained good contact with each other.

Klein examined a photograph from a social media account of either Williams or Martin.  The photo showed Joshua Cole, a BLB member, and Martin wearing clothing associated with the Case gang.  Martin appeared to be flipping off the camera, and Williams was making a "C" with his right hand, symbolizing allegiance to the Case gang.  Klein also reviewed a photograph from an Instagram account believed to belong to Martin, and it appeared that Martin was identifying himself as a Case gang member by using a BLB hand sign.  Klein also reviewed a photograph of Williams's profile, which showed Williams holding up what appeared to be a rifle while standing next to a man holding up the number 4, signifying allegiance with the Case gang.  Klein examined an Instagram account that he believed belong to Oliva, and the account username had the letters "BLB" referencing BLB and the numbers "96" which signified the gang's territory.

Klein also examined a photograph that he believed was on all four defendants' social media accounts.  Several of the individuals in the photograph appeared to be using hand signs that showed allegiance with the Case gang.  Williams was displaying the number 4 in his hand while Martin was displaying an inverted 3, which would be disrespectful toward Case's rival gang, ENT.  The photograph demonstrated to Klein that everybody in the photograph were affiliated with the Case gang and, by extension, Case's BLB subset:  Although the number 4 signified Case, Klein opined, "If they are all demonstrating their Case allegiance, to me, they wouldn't also be demonstrating their allegiance to the other subsets of Case.  So to me, they'd all be demonstrating that, since they are Bossland Baby member, in my opinion, that them displaying 4[']s isn't to display Case association[,] [i]n the circumstances, [but] to display Bossland Baby association."  Klein also opined that, of Oliva's extensive tattoos, one identified him as both a Case and a BLB member.

7

Based on an examination of the defendants' social media accounts, Klein opined that all four defendants were BLB members and that their use of specific signs and symbols was consistent with BLB gang membership.

Klein testified that based on his experience, it was unlikely that BLB members would commit crimes with non-gang members—gang members have "trust" between each other, and trust is lacking between people who are "not part of some form of organization or gang or group."  Klein thus opined that the Campbell, Dublin, and Pleasant Hill robberies were consistent with "promoting, furthering, or assisting criminal conduct by gang members."  Klein, however, acknowledged that he was unaware if any of the defendants sold any of the stolen goods or were otherwise using the stolen goods taken from the San Jose Camera robbery, or the robberies in Dublin and Pleasant Hill. But Klein testified that in his experience as a police officer investigating robberies and through his work with the Ceasefire Unit, suspects will typically take stolen goods to a "fence or some other business" and sell the items in exchange for cash.

### 4.     *The Magistrate's Decision*

Following the preliminary hearing, the magistrate held all codefendants to answer on counts 1 through 8 but did not find sufficient evidence for the section 186.22 gang enhancements or the gang-related section 12022.53 firearm enhancements.  The magistrate found there was insufficient evidence of BLB's primary activities and predicate offenses to establish that BLB engaged in a pattern of criminal gang activity. The magistrate also declined to hold any defendants to answer on count 9, carjacking, citing a lack of jurisdiction under sections 781 and 786.

### C.     *The Information and the Section 995 Motion*

The district attorney filed an information in September 2023 realleging all the same offenses and enhancements as in the second amended complaint, except omitting

the count of assault with a firearm.[5]  In November 2023, Bedford filed a section 995 motion challenging the kidnapping and carjacking charges, as well as all the gang-related enhancements.  With respect to the gang allegations, Bedford argued that there was no evidence that BLB was "organized," that BLB's primary activities were one of the enumerated felonies in section 186.22, that BLB members had committed the requisite predicate offenses, nor that the pattern of crimes commonly benefited BLB.  The other three defendants joined in Bedford's motion.

In December 2023, the trial court granted the defendants' section 995 motion as to all the gang enhancements and gang-related firearm enhancements, concluding that there was no evidence that the offenses were committed for the benefit of a criminal street gang or that the predicate offenses were committed for the criminal street gang's common benefit.  The trial court denied the section 995 motion as to the kidnapping and carjacking counts.

The District Attorney timely appealed.

## II.    DISCUSSION

### A.    *Legal Principles and Standard of Review*

Under section 995, an information will be set aside if the defendant was committed "without reasonable or probable cause."  (§ 995, subd. (a)(2)(B); see *Hale v. Superior Court* (2014) 225 Cal.App.4th 268, 271 ["[a] defendant may utilize section 995 to strike invalid enhancement allegations"].)  "To establish probable cause sufficient to withstand a section 995 motion to dismiss, the People must make some showing as to the existence of each element of the charged offense."  (*People v. Chapple* (2006) 138 Cal.App.4th 540, 545.)  " ' " 'Reasonable or probable cause' means such a state of

---

[5] " '[U]nder Penal Code section 739, the district attorney is not bound by the view of the committing magistrate; he is free to file an information charging the highest offense which any reasonable construction of the evidence adduced at the preliminary hearing admits.' "  (*People v. Barba* (2012) 211 Cal.App.4th 214, 227 (*Barba*).)

facts as would lead a [person] of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." ' " (*People v. Mower* (2002) 28 Cal.4th 457, 473.) "Probable cause 'signifies a level of proof below that of proof beyond a reasonable doubt, or even proof by a preponderance of the evidence.' " (*People v. Superior Court (Mendez)* (2022) 86 Cal.App.5th 268, 276.) "The showing required at this stage 'is exceedingly low' [citation], and an information ' "should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged." ' " (*People v. Garcia* (2018) 29 Cal.App.5th 864, 870–871 (*Garcia*).)

"When we review a section 995 motion, we 'disregard[] the ruling of the superior court and directly review[] the determination of the magistrate.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 654 [reviewing denial of § 995 motion made after magistrate struck special-circumstance allegation].) "[W]e must draw all reasonable inferences in favor of the information [citations] and decide whether there is probable cause to hold the defendants to answer, i.e., whether the evidence is such that 'a reasonable person could harbor a strong suspicion of the defendant's guilt.' " (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072 (*Lexin*).)

As here with respect to the gang evidence presented by the prosecution, "[w]here the facts are undisputed, the determination of probable cause 'constitute[s] a legal conclusion which is subject to independent review on appeal.' " (*People v. Superior Court (Farley)* (2024) 100 Cal.App.5th 315, 326; see also *People v. Scully* (2021) 11 Cal.5th 542, 582 (*Scully*) [independent standard of review applies when magistrate determines that "the People did not put forth sufficient evidence to support the charges"].)

**B.     *Overview of Section 186.22 and its Recent Amendments***

Section 186.22, subdivision (b)(1) provides for an additional punishment if a person is convicted of a felony committed "for the benefit of, at the direction of, or in

10

association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." And under section 12022.53, subdivision (e)(1), an additional firearm enhancement applies to any person who is a principal in the commission of the offense if it is pled and proven that the person violated section 186.22, subdivision (b). Thus, both the gang enhancement under section 186.22, subdivision (b) and the gang firearm enhancement under section 12022.53, subdivision (e)(1) require proof that the defendants committed a crime for a criminal street gang's benefit.

But "[n]ot every crime committed by gang members is related to a gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) "[C]oncerned with 'lax' interpretations of the prior [gang] law that allowed for overly expansive application of gang enhancements" (*People v. Cooper* (2023) 14 Cal.5th 735, 744 (*Cooper*)), the Legislature amended section 186.22 effective January 1, 2022. (Stats. 2021, ch. 699, § 4.) (Assem. Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333).)[6] The amendments to section 186.22 narrowed the definition of a criminal street gang and increased the prosecution's burden of proof by altering the definition of a criminal street gang and instituting new requirements to prove that a criminal street gang engaged in a pattern of criminal gang activity. (See *People v. Renteria* (2022) 13 Cal.5th 951, 961, fn. 6 (*Renteria*).)

---

[6] The Legislature in amending section 186.22 noted that " '[c]urrent gang enhancement statutes criminalize entire neighborhoods historically impacted by poverty, racial inequality, and mass incarceration as they punish people based on their cultural identity, who they know, and where they live.' [Citation.] Groups of residents in certain neighborhoods 'are often mischaracterized as gangs despite their lack of basic organizational requirements such as leadership, meetings, hierarchical decisionmaking, and a clear distinction between members and nonmembers.' " (*People v. Clark* (2024) 15 Cal.5th 743, 760–761 (*Clark*).)

As amended, a "criminal street gang" is now defined as "an ongoing, *organized* association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.) "[C]ollective engagement" under section 186.22, subdivision (f) "calls for a showing of a connection, or nexus, between an offense committed by one or more gang members and the organization *as a whole*." (*Clark*, *supra*, 15 Cal.5th at p. 762, italics added.)

A pattern of criminal gang activity is defined as the prior commission of two or more "predicate offenses." (*People v. Shively* (2025) 111 Cal.App.5th 460, 466 (*Shively*); § 186.22, subd. (e)(1).) These predicate offenses may not include the currently charged offenses (§ 186.22, subd. (e)(2)) and must be among those listed in section 186.22, subdivision (e)(1), which includes robbery. (See § 186.22, subd. (e)(1)(B).) In addition to requirements not relevant here, the predicate offenses must have "*commonly benefited* a criminal street gang, and the common benefit from the offenses is more than reputational." (§ 186.22, subd. (e)(1), italics added.) "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

C. *Analysis*

The magistrate at the preliminary hearing did not hold the defendants to answer on the gang-related enhancements because there was insufficient evidence that the predicate offenses were committed for the gang's benefit and insufficient evidence of the gang's primary activities. Preliminarily, we observe that the People would have us limit our review to the magistrate's finding that there was a lack of common benefit and that

12

considering whether the other elements of section 186.22 had been satisfied— BLB's organization, its primary activities, and collective engagement of its members in the predicate offenses—improperly "expand[s] the scope of inquiry" on appeal. We disagree. Because the magistrate made no express findings on these other elements, our task is to " 'decide from the evidence adduced at the preliminary hearing, without attempting to reconcile conflicts or judge the credibility of the witnesses, whether there is reasonable or probable cause to believe the defendant guilty of the offense charged.' " (*Barba*, *supra*, 211 Cal.App.4th at pp. 227–228.) This requires an examination of whether there is reasonable or probable cause to believe there is sufficient evidence of *all* elements of section 186.22, subdivision (b). (*Lexin*, *supra*, 47 Cal.4th at p. 1072.)[7]

And reviewing the magistrate's decision and drawing all reasonable inferences in favor of the information, we agree that there is no probable cause to hold the defendants to answer on the gang-related enhancements. (See *Lexin*, *supra*, 47 Cal.4th at p. 1072.)

### 1. *Common Benefit*

Drawing all reasonable inferences in favor of the information, we find that there is insufficient evidence of a common benefit to BLB from the predicate offenses. (§ 186.22, subd. (e)(1); see *Lexin*, *supra*, 47 Cal.4th at p. 1072.)

Several California Supreme Court cases have discussed the meaning of what constitutes a common benefit to a gang that is more than reputational. The California Supreme Court in *Cooper*, *supra*, 14 Cal.5th 735 rejected the claim that a gang's remunerative crimes necessarily supply a common benefit that is more than reputational. (*Id.* at p. 743.) "While robbery and the sale of narcotics typically provide a financial benefit to the *offender*, the record contains evidence that could rationally lead to a

---

[7] Indeed, the People's opening brief broadly argues, without further analysis, that *all* elements of the section 186.22 enhancement were proven, including that BLB is an ongoing, organized group and that BLB members collectively engaged in predicate offenses.

contrary finding regarding whether the fruits of the offenses were intended to or did benefit the *gang as a whole.*" (*Ibid.*) *Cooper* observed that "[i]f all that were required to prove a predicate offense is that the prosecution show that the gang member committed as one of the gang's primary activities any one of the enumerated predicate offenses that typically involve a financial benefit, then the additional requirement that the predicate offenses also 'commonly benefited a criminal street gang' in a 'more than reputational' manner would be mere surplusage." (*Id.* at p. 744.)

Likewise, in *People v. Lamb* (2024) 16 Cal.5th 400 (*Lamb*), the California Supreme Court observed that a gang member's conviction for financial crimes did not establish common benefit because nothing in the record "prove[d] that *the gang* benefited financially or otherwise in a manner that was more than reputational." (*Id.* at p. 454.) And in *People v. Hin* (2025) 17 Cal.5th 401 (*Hin*), the gang expert testified that predicate offenses could have both reputational and non-reputational benefits to the gang—gang members may generate revenue for the gang by engaging in activities such as drug sales or car theft, but gang members may also engage in certain crimes to enhance their reputation. (*Id.* at p. 463.) The *Hin* court held that this evidence did not show that the predicate offenses were "for the benefit of the gang rather than for personal gain." (*Ibid.*)

Following *Cooper*, *Lamb*, and *Hin*, the Four District recently decided *Shively*, *supra*, 111 Cal.App.5th 460, which analyzed whether there was sufficient evidence to support a jury's true findings as to gang allegations. (*Shively*, at p. 468.) In *Shively*, a gang expert testified that the East Coast Crips gang's primary activity was residential burglary because it is not an easy crime to solve and " 'it is financially lucrative.' " (*Id.* at p. 467.) The expert then testified about five predicate offenses that he had investigated, which were all burglaries. (*Ibid.*) On appeal, the Fourth District found insufficient evidence to support the gang allegations because the prosecution "offered inadequate evidence that at least two predicate offenses commonly benefited the gang in a way that was more than reputational." (*Id.* at p. 469.) The Fourth District noted that

14

the gang expert did not provide "any testimony or other evidence the burglaries *in fact* financially benefited the gang rather than the individual gang members who committed the burglaries." (*Ibid*.) Thus, the "limited and conclusory" evidence suggested that the jury's true findings on the gang allegations were based on conjecture. (*Id.* at p. 470.)

Although they are procedurally distinguishable, all four cases are instructive on what constitutes a " 'common benefit' " to the gang. (*Cooper*, *supra*, 14 Cal.5th at p. 742 [whether failure to instruct on elements of § 186.22 as amended by Assem. Bill 333 was harmless]; *Lamb*, *supra*, 16 Cal.5th at p. 449 [accord], *Hin*, *supra*, 17 Cal.5th at p. 464 [accord]; *Shively*, *supra*, 111 Cal.App.5th at p. 468 [whether sufficient evidence supported jury's findings on gang allegations].) Generic testimony about predicate offenses that *inherently* have a financial component such a robbery is not evidence that a predicate offense provided the *gang* with a financial benefit or motivation, as opposed to benefitting or motivating only those specific participating members. (See *Cooper*, at p. 744; *Lamb*, at p. 451; *Hin*, at p. 463; *Shively*, at p. 469.)

The evidence presented in this case was thin, based as it was on Klein's conclusory testimony. Klein testified that proceeds were divided among participants to a crime, in proportion to their level of participation: If "somebody does more, or somebody does less, there is the possibility of them divvying it up differently." And as to the predicate offenses here, Klein did not know how the goods stolen from the Mike's Camera locations in Dublin and Pleasant Hill had been divided or used. The fact that robberies contemplate an inherent financial benefit is not by itself evidence of financial gain or motivation as a *common* benefit to the organization. (§ 186.22, subd. (g); *Cooper*, *supra*, 14 Cal.5th at p. 743.) We remain mindful of the " 'exceedingly low' " bar under section 995 (*Garcia*, *supra*, 29 Cal.App.5th at p. 870), but the record is devoid of evidence that the predicate offenses "actually benefited the gang" as a whole, as distinct from the individual members who participated in the crime. (See *Cooper*, at p. 743; *Lamb*, *supra*, 16 Cal.5th at p. 451; *Hin*, *supra*, 17 Cal.5th at p. 463; *Shively*, *supra*,

15

111 Cal.App.5th at p. 469.) The evidence suggests only that the robbery proceeds are divided among individual members according to their degree of participation in the robbery.

To be sure, Klein at one point referred to money from robberies committed by gang subsets being "shared only within the subset as a whole to each individual gang member," but he did so to explain that proceeds did not flow "up the organizational ladder" to the Case gang, even when multiple Case subsets joined forces; Klein at no point claimed that BLB members who did not participate in a given crime ever shared in its proceeds by virtue of BLB membership alone. And Klein on cross-examination also testified that "each member that commits those crimes gets equal profit or somehow divvies it up within their own group." To the extent this suggests there were some inconsistencies with his testimony, we would typically resolve such inconsistencies in favor of the information. (*People v. Reid* (2024) 105 Cal.App.5th 446, 461–462 [we do not "attempt to resolve any inconsistencies in the preliminary hearing evidence," and " 'if there is *some evidence* in support of the information, [we] will not inquire into its sufficiency' "].)

However, to the extent that portions of Klein's testimony taken in isolation might appear to suggest that "their own group" might include nonparticipating BLB members, it appears that Klein himself failed to appreciate the distinction that section 186.22 requires us to observe between benefit to BLB members individually and benefit to BLB on an organizational level, as he vacillated between confirming that individual gang members received a financial benefit from the robbery and inferring that BLB thereby received a benefit. Moreover, even under an expansive reading of Klein's testimony, we cannot rely on his " 'purely conclusory' " expert opinion to find probable cause. (*People v. Ramirez* (2016) 244 Cal.App.4th 800, 816.)

For example, in *Ramirez*, *supra*, 244 Cal.App.4th 800, the Fourth District found an expert's opinion that the Sureños are a criminal street gang to be unpersuasive when his

16

testimony merely identified two Sureño subsets by name, characterized the two subsets as aligned with the Sureños, and testified to the alleged predicate offenses. (*Id.* at p. 815.) As in *Ramirez*, the expert testimony here is similarly limited. Much of Klein's testimony about both the Case gang and BLB suggested only that Case and BLB were loose affiliations with no formal hierarchy, no formal rules, and hazy geographical bounds. To the extent Klein testified that BLB had a structure, it was one in which "essentially, everybody has equal say" and that the "goals in . . . th[e] group is to commit certain crimes." Klein did not specify the foundation for his opinion that BLB had a structure or his view of how proceeds of member crimes were divided. Klein testified that he had been a secondary investigator in three BLB investigations, two for firearm possession and one for robbery. But Klein did not describe these investigations in any detail, nor did he describe the circumstances of the robbery that he investigated or how the proceeds from that robbery were distributed.

Relying on *Albillar*, *supra*, 51 Cal.4th 47, the district attorney argues that the actions of the codefendants in concert raise an inference of a shared agreement and intent that the robberies were gang related. But *Albillar* predates the amendment to section 186.22 that now requires "a heightened showing both that the predicate offenses 'commonly benefited a criminal street gang' and that the common benefit is 'more than reputational.' " (*Cooper*, *supra*, 14 Cal.5th at p. 744; § 186.22, subd. (e)(1).) The district attorney claims that the California Supreme Court reaffirmed the reasoning in *Albillar* post-Assembly Bill 333 in *Renteria*, *supra*, 13 Cal.5th at p. 963. But *Renteria* was likewise decided "under [former] law in effect at the time of Renteria's trial." (*Renteria*, at p. 961.) We therefore do not read *Renteria* as holding that *Albillar*'s analysis applies in post-Assembly Bill 333 cases. And here, there is scant evidence of *who* participated in

the predicate robberies, with Martin being the only defendant (and alleged BLB member) identified as a perpetrator.[8]

The district attorney further characterizes the evidence as showing that the defendants were engaged in a conspiracy which inured to BLB's common benefit, as the two Mike's Cameras robberies, the carjacking, and the robbery at San Jose Camera collectively permit an inference that the defendants had a "common purpose and intent to benefit BLB as a whole." We take as established for now that all defendants are BLB members. But there is no evidence that the predicate offenses were a part of a conspiracy to benefit BLB as a gang as opposed to enriching individual defendant members. That BLB gang members came together to commit certain crimes does not show the crimes themselves commonly benefited BLB.[9]

The district attorney nonetheless argues the record shows that BLB members were "pooling" the robbery proceeds and, because not all the stolen merchandise was immediately sold, that there must have been "subordination of some individual interest to the control of the organization." But neither pooling nor subordination is suggested by the evidence. The only evidence to support the district attorney's argument is that some Mike's Camera merchandise was found in homes related to the codefendants, signifying that the participants in the robberies did not immediately try to sell *all* the stolen goods. But nothing in the record suggests a pool of undivided loot, much less an intent to bank

---

[8] Although we take no stance on Klein's opinion that the defendants were BLB members, we note that during part of his testimony he identified certain individuals as BLB members based on photographs where members were making hand signs or had indicia that they were members of Case, not BLB.

[9] Klein opined that all three robberies were consistent with promoting, furthering, or assisting criminal conduct by gang members. But this goes toward the specific intent element of section 186.22, subdivision (b)(1), that a felony committed for the gang's benefit must be committed "with the specific intent to promote, further, or assist in criminal conduct by gang members."

that loot for gang purposes rather than for individual participant profit. On this record, we can only speculate whether the delay in liquidating stolen goods means that BLB benefited from the robberies.

Finally, the district attorney argues that there were other "common benefits" provided to the BLB gang from the robberies in addition to a perceived financial incentive, including "the ability to commit crimes that a single [defendant] could not accomplish by providing access to the gang's membership, criminal sophistication, and apparatus," "[the] greater likelihood of success," and "perceived reduced likelihood of arrest and/or prosecution." But these are not benefits that *BLB* receives from the commission of predicate offenses as is required under section 186.22, subdivision (e)(1); these are benefits that individual *members* might expect when committing crimes with other gang members—not what the statute plainly requires. "[W]e presume the Legislature intended everything in a statutory scheme, and we should not read statutes to omit expressed language or include omitted language." (*Jurcoane v. Superior Court* (2001) 93 Cal.App.4th 886, 894.)

The bar for a section 995 motion is low, and all that is required is at least " 'some showing as to the existence of each element' " of the gang enhancement. (*Scully*, *supra*, 11 Cal.5th at p. 585.) But "some showing" of common benefit to BLB as required by section 186.22, subdivisions (f) and (g) nonetheless requires more than faith, speculation, or foundationless opinion. The testimony at the preliminary hearing is insufficient.[10]

---

[10] In his opening brief, the District Attorney argues that evidence that respondents Williams and Bedford posted photographs on their social media accounts holding guns is evidence that they engaged in illegal possession of firearms, suggesting that the possession of firearms can also be used as predicate offenses. But with respect to firearms in the gang, Klein generally testified only that firearms "demonstrate[] power" and "the ability to defend themselves if necessary from other rival gangs" and that the "firearms overall is a sign of intimidation, a sign of fear." This testimony does not suggest anything other than a reputational benefit derived from the possession of firearms, which is inadequate under section 186.22, subdivisions (e) and (g).

**2.** *Collective Engagement*

Drawing all inferences in favor of the information, we also conclude there is insufficient evidence to support an inference that BLB members collectively engaged in the pattern of criminal gang activity that the statute requires. (§ 186.22, subd. (f).)

"[C]ollective engagement requires a nexus between the individual predicate offenses and the gang as an organized, collective enterprise. This organizational nexus requirement is satisfied by showing a connection between the predicate offenses and the organizational structure, primary activities, or common goals and principles of the gang." (*Clark*, *supra*, 15 Cal.5th at p. 749.) Recognizing that "some gangs may have loosely defined goals and principles, while others may have clearly defined missions," *Clark* acknowledged that "collective engagement will be established in different ways." (*Id*. at p. 762.) "[F]or example, there might be evidence of a direct order from the gang to commit specific crimes. [Citations.] Alternatively, evidence might show a more general, well-understood expectation that members must engage in certain types of offenses. [Citation.] In other cases, collective engagement might be shown by demonstrating that the offenses are reflective of the primary activities of the gang, or else adhere to a common goal or plan characteristic of the gang in question." (*Ibid.*)

In this case, there is insufficient evidence of any organizational nexus between the predicate offenses and BLB. As BLB is allegedly a gang that has no leader, there was no evidence of any gang leader directing members to commit crimes. Nor was there any evidence that there were any directives from any more influential leaders of the subset to commit certain type of crimes. Klein opined that BLB had a loose, nonhierarchical structure where members had equal say in its activities and directions. But there was also no evidence that the predicate robberies were committed based on a group decision made by the gang members. And there was no evidence that the predicate robberies were based on an "expectation that members must engage in certain types of offenses." (*Clark*,

20

*supra*, 15 Cal.5th at p. 762.) Klein testified only vaguely that the goals of BLB were "to commit certain crimes."

There was some evidence that all three robberies had certain commonalities, in that the perpetrators targeted similar types of stores. But by itself, the similarity of targets does not otherwise reasonably suggest that these types of robberies were "reflective of the primary activities of the gang, or else adhere to a common goal or plan characteristic of the gang in question." (*Clark*, *supra*, 15 Cal.5th at p. 762.) Even assuming we can discern that one of BLB's primary activities is to commit robberies, there was minimal evidence about the predicate offenses themselves—for both Mike's Camera robberies, masked men entered the stores with firearms to steal valuable inventory—from which to infer that the robberies adhered to a "plan characteristic of the gang in question." (*Ibid.*; see *People v. Chhoun* (2021) 11 Cal.5th 1, 16 [evidence that home invasion robberies are "complex crimes, with specific jobs typically assigned to different members"].)

Even though the collective engagement requirement is "conceptually distinct from the requirement to prove that each predicate offense 'commonly benefited' the gang," the *Clark* court recognized that "the facts necessary to prove the two requirements will often overlap with one another." (*Clark*, *supra*, 15 Cal.5th at p. 763.) Thus, the same deficiencies in the evidence of a common benefit to BLB also undermine the prosecution's showing of collective BLB engagement in the robberies. The requirement of collective engagement "relate[s] to the essential characteristics of the criminal street gang—its organizational structure, primary activities, or common goals and principles." (*Ibid.*) But Klein's testimony about BLB at most suggests that BLB is related to the overarching Case gang, though there is no larger structure, and it is unclear whether crimes committed by BLB members are for BLB's common benefit or for the individual benefit of its gang members.

21

The addition of the collective engagement requirement "was . . . in service of the Legislature's broader goal of differentiating between the threat posed by organized groups collectively engaged in criminal activity, versus the threat posed by individual, loosely connected persons who happen to commit crimes." (*Clark*, *supra*, 15 Cal.5th at p. 761.) Here, there was insufficient evidence that the predicate offenses had a nexus with the gang's primary activities or common criminal goal, rather than being committed by loosely connected individuals with no organizational nexus to the larger BLB gang subset. (See *Scully*, *supra*, 11 Cal.5th at p. 585.)

### 5. *Conclusion*

For these reasons, we conclude that there was insufficient evidence that " 'a reasonable person could harbor a strong suspicion' " that BLB's predicate offenses were either committed for the gang's common benefit or that the gang members collectively engaged in a pattern of criminal gang activity as defined under section 186.22. (*Lexin, supra,* 47 Cal.4th at p. 1072.) Finding insufficient evidence that BLB meets the definition of a criminal street gang under section 186.22, we discern no error in the trial court's partial grant of the section 995 motion as to the gang enhancements and gang-related firearm enhancements as to all defendants.

## III. DISPOSITION

The trial court's order partially granting defendants' Penal Code section 995 motion is affirmed.

22

_____
LIE, J.

WE CONCUR:


_____
GROVER, Acting P. J.


_____
WILSON, J.


*People v. Bedford et al.*
H051908